687 A.2d 681

**In re ADOPTION/GUARDIANSHIP No. 93321055/CAD in the Circuit Court for Baltimore City et al.**

**No. 25, Sept. Term, 1996.**

Court of Appeals of Maryland.

Jan. 16, 1997.

Donna R. Heller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Petitioner.

Michael R. Braudes, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

We have before us five cases in which the State sought guardianship of a child pursuant to Maryland Code (1984, 1991 Repl.Vol.), § 5–313 of the Family Law article. A judgment of guardianship under that section terminates the parental rights of the parents of the child and permits the State, through its Department of Social Services (DSS), to consent to the subse-

quent adoption or other long-term placement of the child without the need for any further consent of the parents.

Both the Code and the Maryland Rules set forth a procedure for bringing and prosecuting these kinds of cases. That procedure will be described in some detail below. Suffice it to say here that, if a parent does not affirmatively consent to the guardianship, he or she is entitled to notice of the State's petition and an opportunity to object to it. The notice is given through a show cause order issued by the court. If a parent does not file a written objection within the time specified in the show cause order, the court is directed to consider the parent to have consented to the guardianship and to treat the petition accordingly.

We granted *certiorari* in these cases to consider three questions, which we rephrase slightly as follows:

(1) Does the circuit court have authority to accept and consider an objection filed after the time specified in the show cause order;

(2) If a parent fails to file a timely objection as directed in the show cause order and is therefore deemed to have consented to the DSS petition, may the parent thereafter revoke that deemed consent; and

(3) May a parent who fails to file a timely objection collaterally attack a judgment of guardianship entered in the case on the ground that the parent did not receive notice of the judgment or proceedings leading to it?

Regrettably, after delving into the records of these cases, we discovered that (1) the first question was squarely raised in only three of the five cases and is moot in those cases, and (2) the fourth case, because of its procedural posture, does not present any of the three questions directly. The fifth case raises the second and third questions, which overlap. In the context of that case, we shall answer those questions. For reasons to be explained, we shall address the first question as well, notwithstanding its mootness.

Our answer to the first question is "ordinarily no." Our answer to the second is "no" with a caveat. Our answer to the third is an unqualified "no."

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. *No. 93321055*

On November 17, 1993, DSS filed a petition in the Circuit Court for Baltimore City for guardianship of Marlo and Marlen C. and to terminate the parental rights of their mother, Monique C., and their putative father, Eugene A. The children were born on May 9, 1991, cocaine addicted and in need of extraordinary care. They were placed in foster care five weeks later—on June 19, 1991. In October, 1991, they were found by the juvenile court to be children in need of assistance (CINA) and formally committed to the custody of DSS.

Upon the filing of DSS's petition for guardianship, show cause orders were issued by the court informing the parents of the petition, enclosing a copy of it, advising them of their right to file an objection to the petition by a certain date, and stating the court's address, where the objection should be filed. The orders warned, in capital letters, that "IF YOU DO NOT FILE A NOTICE OF OBJECTION ON OR BEFORE THE DEADLINE STATED ABOVE A DECREE TERMINATING YOUR PARENTAL RIGHTS MAY BE ENTERED WITHOUT YOUR CONSENT." Attached to the show cause order was a form entitled "Notice of Objection"; it too warned, in capital letters, that "IF YOU WISH TO OBJECT, YOU MUST FILE YOUR NOTICE OF OBJECTION WITH THE COURT ON OR BEFORE THE DEADLINE STATED IN THE SHOW CAUSE ORDER." All that the parent had to do was to sign the objection form, print his or her name, address, and telephone number, and mail or deliver it to the court.

The show cause order was served on Monique on July 26, 1994; it required that any objection by her be filed by August

11, 1994. Eugene was not served until November 14, 1994.[1] The order required that any objection be filed by January 9, 1995. On January 19, 1995—five months after the deadline set for Monique and almost two weeks after the deadline set for Eugene—they each filed an objection. DSS moved to strike the late-filed objections.

The court conducted a hearing on the DSS motion on June 30, 1995. Monique did not appear. Eugene appeared and explained that he had read the show cause order and was aware of the deadline, that he had taken some papers to the clerk's office at some unspecified time but was told that they were filled out incorrectly, that he took them back three or four times only to find the clerk not there, and that he did not think a week or so delay "would make a difference." DSS informed the court that the parents had not visited the children since 1991 and that the last contact DSS had with Eugene was in 1993, when he was told that DSS intended to proceed with adoption rather than continued foster care. The court was also informed that the children had no concept of a biological parent, that they had been placed in a pre-adoptive home in February, 1995 and were doing well there, and that the plan was to have that couple adopt the children.

On this evidence, the court granted the motion with respect to Monique but denied it as to Eugene. It found that, although Eugene "could have filed [the objection] more timely" and failed to do so, "it is just a matter of days." DSS filed an appeal from the denial of the motion as to Eugene as well as a motion to reconsider that decision. On August 9, 1995, the court denied the motion to reconsider. In an amended order, it confirmed its decision to strike Monique's objection, finding no timely intervention by her, and also confirmed its decision to allow Eugene's objection, finding that his objection, though filed 10 days "after the expiration of time for objection

1. The show cause order was served on Eugene by alternate service— ordinary mail to his last known address and leaving a copy with his sister—based on a finding that he had been avoiding service of earlier-issued show cause orders.

within the Show Cause Order, is sufficiently timely to allow this objection to be received by this Court." DSS filed another appeal from that order.[2]

The court conducted a hearing on the merits on January 25, 1996. Eugene did not appear. On February 26, 1996—more than two years after the petition was filed—the court entered an order appointing DSS as guardian of the children with the right to consent to their adoption. That order effectively terminated the parental rights of Monique and Eugene.

### B. *No. 95089042*

On March 30, 1995, DSS filed a petition in the Circuit Court for Baltimore City for guardianship of Devonta H. and to terminate the parental rights of his mother, Evonne H., and his putative father, Ali J. or Paul W. Devonta was born on May 15, 1993; he was placed in foster care on October 7, 1993, and was found to be a CINA on May 16, 1994.

Show cause orders were issued on April 18, 1995, setting a deadline of July 19, 1995 for objections and giving the same printed warnings noted in our discussion of No. 93321055, *supra*. Ali filed a timely objection. Evonne was served on May 15, 1995. She filed an objection, on the form included with the show cause order, on August 22, 1995—a month late. DSS moved to strike the objection. At a hearing on the motion, Evonne testified that she misplaced the paper and did not find it until August. DSS informed the court that Devonta was in an approved pre-adoptive home and that the plan was for him to be adopted if the DSS petition was granted. The court expressed some disbelief that Evonne "would be served with notice of termination of your parental rights and you would lose it," but denied the motion nonetheless, essentially because there would have to be a trial in any event due to Ali's objection. DSS filed an appeal.

---

**2.** The first appeal was dismissed by the Court of Special Appeals for failure to file a prehearing information report, as required by Md. Rule 8–205. That report was filed in connection with the second appeal.

Notwithstanding her objection, when the hearing on the merits occurred seven months later, on June 7, 1996, Evonne failed to appear, and the court granted the petition for guardianship.

## C. *No. 95108035*

On April 18, 1995, DSS filed a petition in the Circuit Court for Baltimore City for guardianship of Portia and William G. and to terminate the parental rights of their mother, Veronica D. The father of the children had died. Portia was born on April 16, 1988. Three months later, she was found to be a CINA and committed to DSS for placement with relatives. She was returned to Veronica in July, 1990, but was replaced in foster care in November, 1993. William was born on August 22, 1990. He was found to be a CINA and committed to DSS on January 17, 1994.

A show cause order, containing all of the information noted above, was served on Veronica on May 6, 1995. It set a deadline of July 26, 1995 for her to file an objection to the petition. Veronica filed an objection on August 10, 1995, which DSS moved to strike. At a hearing held on November 16, 1995, Veronica's lawyer informed the court that Veronica had "mistakenly allowed the time to elapse"—that "it just got away from her." It appears from the transcript that Veronica was not in court when the hearing began, that she appeared about an hour late, and that the court saw no reason to hear from her. It denied DSS's motion and set the matter in for hearing on the merits in June, 1996. DSS filed an appeal from the denial of its motion.

In its brief, the State informed us that the hearing did not occur until August and that no decision had been made in the matter. Even at oral argument in this Court on December 5, 1996, no one seemed to know whether the circuit court had yet decided the case. In fact, we were informed that, on September 16, 1996, the court entered a judgment of guardianship, and we have had the record before us supplemented to include that judgment.

### D. *Nos. 11711 and 11712*

On May 4, 1994, DSS filed petitions in the Circuit Court for Montgomery County for guardianship of Andrew J. and Unique O. and to terminate the parental rights of their mother, Nicole S., and their respective fathers, Andre J. and Tony O. Andrew was born on March 1, 1992. He was placed in the custody of DSS and put into foster care on January 12, 1993. In April, he was found to be a CINA by the juvenile court. In July, 1993, he was returned to his mother or other relatives but five weeks later was placed back in foster care.

Unique was born March 14, 1993. She was placed in the custody of DSS and put into foster care two days later. In April, 1993, she was found to be a CINA by the juvenile court. Like her half-brother, Andrew, she was returned to Nicole in July but placed back into foster care in August.

Show cause orders were issued on May 10, 1994, setting a deadline of July 8, 1994 for filing an objection and giving the advice and warnings noted above. Nicole was served on June 10, 1994. No objection was filed, and, on September 27, 1994, upon motion by DSS, the court entered an order granting the petitions.

On June 12, 1995, Nicole filed what she termed a Revocation of Consent to Petition for Guardianship with respect to each child. She noted in her Revocations that, pursuant to what is now Family Law article, § 5–322(d), her failure to file an objection had been deemed a consent to the guardianship and that, under § 5–311(c) of that article, she was authorized to revoke her consent at any time prior to the entry of a final decree of adoption. As no such decree had yet been entered with respect to Andrew or Unique, she averred that she still had the right to revoke her presumed consent and object. Along with those Revocations, she filed a motion in each case to vacate the guardianship order. At a hearing on the motion in August, 1995, she argued, through counsel, that her due process rights had been violated because she never received notice of DSS's motion for the guardianship order or notice of

a hearing on the motion. The court denied Nicole's motions, and she appealed.

### E. *Nos. 11387 and 11388*

On April 21, 1993, DSS filed petitions in the Circuit Court for Montgomery County for guardianship of Stephon and Alphonso P. and to terminate the parental rights of their parents, Clemy P. and Sam L. Stephon was born on April 16, 1989. He was committed to the custody of DSS in August, 1990, was placed with his mother or other relatives until September, 1991, and had been in foster care since then. He was adjudicated to be a CINA in October, 1991. Alphonso was born on August 3, 1990. He was committed to DSS at birth, resided with his maternal grandmother until September, 1991, and had been in foster care thereafter.

Sam L. consented to the petition. The show cause order issued for Clemy P. was served on her on May 11, 1993. It gave her the same advice and warnings noted above and set June 25, 1993 as the deadline for filing an objection. No objection was filed, and, on October 20, 1993, upon motion by DSS, the court granted the petition and entered a judgment of guardianship. Clemy filed an appeal 32 days later, which the circuit court struck as untimely.

On July 25, 1994, through their court-appointed counsel, the children requested a hearing. They averred that a number of problems had developed since the order of guardianship had been entered. They pointed out that, under Family Law article, § 5–319, DSS was obliged to make a written report to the court and to give notice to both the children's attorney and the natural parents if placement for adoption was not made within nine months after entry of the guardianship, that nine months had passed, that the children had not been placed for adoption, and that no report had been made. Underlying that problem, they averred, was the fact that they were not going to be able to remain in the home where they were then living because the foster mother was not willing to adopt them. Compounding the problem was the additional circumstance that their sister was also living in the home, that their natural

parents' parental rights had not yet been terminated with respect to their sister, and that "this is causing problems for all three children, as the mother is still visiting and talking by phone with [the sister], but is not able to talk with [them], causing upset to Stephon and Alphonso." Among other things, they asked that their maternal grandmother be considered as a resource.

Three days after the children's motion was filed, Clemy P. moved to intervene. She too complained about (1) the failure of DSS to make a written report as the statute required, (2) its refusal to consider her mother as a resource, and (3) the impending separation of Stephon and Alphonso from their sister. She complained as well that the guardianship order was entered without any testimony and that she "did not receive notice of the Motion or Order of Default due to a change of address until the time for appeal had expired." She averred that she was then ready to resume custody of the children.

DSS opposed the children's motion and Clemy's request to intervene. As to the children's motion, it informed the court that it intended to place Stephon and Alphonso in a pre-adoptive home within 10 days and that no hearing would be necessary. As to Clemy's motion, DSS pointed out that there had never been a default order, that Clemy received all of the notices to which she was entitled, and that there were no proceedings pending before the court. The docket indicates that a "status hearing" was held by Judge McGuckian on August 11, 1994, but neither the docket nor anything else in the record indicates how, or whether, the children's and Clemy's motions were resolved.

On July 5, 1995—some 21 months after the judgments of guardianship were entered—Clemy moved to vacate them. Although she did not deny receiving a copy of the show cause order and did not deny reading it, she alleged that she "was not aware of the necessity of filing a written response" to the guardianship petitions and "remained unknowing as to the significance of [those petitions]." She claimed that she had

expressly declined to consent to the guardianships, that she had informed DSS orally that she would not consent, and that she did not become aware of the judgments until a month after they had been entered. She averred that the children had still not been adopted and continued to live in foster care.

Clemy complained that she had received no notice of DSS's motion for final order and, indeed, no notice of any proceedings after the initial petition. She urged that the judgments were defective because they were based on her presumed consent and she was never informed of her right to revoke that consent. Her theory seemed to be that, once DSS took the position that her non-response amounted to a consent, it was obliged to inform her of her right to revoke that consent. She complained as well about not receiving a copy of the judgments or of any status report required by § 5–319.

On December 5, 1995, the court entered an order vacating the judgments of guardianship. In an accompanying opinion, the court held that, although Clemy may be deemed to have consented to the guardianships by not filing a timely objection, she retained the right to revoke that deemed consent and to receive notice of all further proceedings, including service of all pleadings. The court, at least tacitly, appeared to regard the failure of DSS to serve a copy of its motion for final order on Clemy as an irregularity under Md. Rule 2–535, thereby justifying a setting aside of the 21–month old judgments.

DSS promptly filed a motion to alter or amend that order as well as a request to stay its effect. The motion for stay was supported by a letter from Stephon's psychiatrist and pointed out that (1) Clemy had requested that the children be immediately returned to her, (2) unless the order was stayed, DSS's authority to continue the children in foster care would terminate, and (3) immediate return of the children would be detrimental to them.

The court initially stayed the December 5 order but ultimately denied the motion to alter or amend, and this appeal

by DSS ensued. Whether the stay is still in effect is not entirely clear.[3]

## II. STATUS OF THE CASES IN TERMS OF THE ISSUES PRESENTED

### A. Nos. 93321055, 95089042, 95108035

■ As we observed in Part I, the only appeals in these three cases are those of DSS, complaining of the orders denying its respective motions to strike the untimely objections filed by one or both of the parents. When those appeals were filed, no judgment had been entered in the cases; the appeals were from orders that were clearly interlocutory. We need not address here whether those appeals were proper, for subsequent events have made the three appeals moot. The State acknowledges, as it must, that the appeals in the first two cases are moot, and, because of the post-appeal judgment entered in No. 95108035, that case has also been rendered moot.[4] The objecting parents' parental rights were terminat-

---

3. The motion to alter or amend was denied on February 14, 1996. DSS filed its appeal on February 27, 1996 and, at the same time, moved to extend the stay during the pendency of the appeal. Docket Entry No. 48 indicates that, on March 1, 1996, the court entered an order extending the stay pending final decision on appeal, although no such order appears in the record. Docket Entry No. 51 indicates that, on March 12, 1996, Clemy's motion to strike the order extending the stay was granted, although no order to that effect appears in the record. Two conflicting entries appear under the date of March 14, 1996. No. 52 states that Clemy's request that the court strike the order extending the stay was granted; No. 54, on the other hand, states "Order of Court (McGuckian, J.) that stay entered December 7, 1995 be extended pending final decision on appeal filed." There are no orders in the record supporting either of the March 14 docket entries. Indeed, the record contains no papers between No. 49 and No. 56.

4. In its brief and at oral argument, the State conceded that the appeals in Nos. 93321055 and 95089042—the ones in which it knew a judgment of guardianship had been entered—were moot. Not having bothered to check the docket in No. 95108035—an inexcusable lapse—the parties were unaware that judgment had been entered in that case as well. The State attempted to find a right to appeal the interlocutory order under Family Law article, § 5–330, which provides that "[a]ny party to an adoption proceeding may appeal to the Court of Special Appeals from

ed after a hearing on the merits, and it is therefore utterly immaterial at this point whether the court erred in allowing the untimely filed objections. Even if DSS is correct and the court erred in considering the untimely objections, DSS has won on the merits, and there is no effective relief that we can provide. We shall therefore dismiss these three appeals.

## B. *Nos. 11711 and 11712*

Nicole's appeals in these two cases are from an order denying her motion to vacate an enrolled judgment. The motion to vacate was filed more than 30 days after the judgment was entered and is therefore deemed to have been filed under Md. Rule 2–535(b). Under that rule, a court may revise an enrolled judgment upon a finding of fraud, mistake, clerical mistake, or other irregularity if, in addition, the movant establishes that she acted in good faith and with ordinary diligence and that she has a meritorious defense. *Owl Club v. Gotham Hotels,* 270 Md. 94, 100, 310 A.2d 534, 537 (1973); *Maryland Lumber v. Savoy Constr. Co.,* 286 Md. 98, 101–02, 405 A.2d 741, 743–44 (1979).

The denial of a motion to revise under Rule 2–535(b) is appealable, but the only issue before the appellate court is whether the trial court erred as a matter of law or abused its discretion in denying the motion. *New Freedom Corp. v. Brown & Meyer,* 260 Md. 383, 386, 272 A.2d 401, 403 (1971); *S. & G. Realty v. Woodmoor Realty,* 255 Md. 684, 690–92, 259 A.2d 281, 283–85 (1969).[5] Except to the extent that they are subsumed in that question, the merits of the judgment itself

---

any interlocutory or final order or decree." (Emphasis added). It will suffice to remind the State that No. 9510835 was not an adoption proceeding. It arose from a petition for guardianship. No adoption was sought or decreed.

**5.** *New Freedom* and *S. & G. Realty* hold that the issue on appeal from the denial of a motion under what is now Rule 2–535(b) is whether the trial court abused its discretion in denying the motion. That holding may be too narrow. If the court denies the motion based on its conclusion that the event or conduct underlying the motion did not constitute cognizable fraud, mistake, or irregularity or on the ground that the movant had not demonstrated a meritorious defense or claim

are not open to direct attack. In order to challenge the judgment itself, a timely appeal must be taken from it.

■ In these cases, Nicole filed her Revocation and motion to vacate nine months after the judgment of guardianship was entered and eleven months after the deadline for objecting. She produced no evidence of either due diligence or a meritorious defense to the petition. Indeed, she produced no evidence at all. The attack on the judgment was based entirely on counsel's argument that, as a matter of law, Nicole had until entry of a judgment of adoption to object. At no point in her argument did counsel offer any evidence that Nicole actually believed that she had that extended time or that she had any reason for not acting sooner. As DSS pointed out, the show cause order was also served on the attorney who represented Nicole at the CINA hearing. There was no evidence, or even any suggestion, that Nicole was ill or otherwise incapacitated. Nor was there any indication of what defense she would have interposed to the petition. The children had been found CINA in 1993 and had been in foster care for over two years. There had been no contact by Nicole during that time with DSS and apparently none with the children.

On this record, we find no error of law and no abuse of discretion in the denial of Nicole's motions to vacate; we therefore shall affirm the orders denying those motions.

### C. *Nos. 11387 and 11388*

■ These appeals by DSS arise from an order granting a motion to revise under Md. Rule 2–535(b) and vacating en-

and that conclusion is challenged as being erroneous as a matter of law, the issue on appeal would be a purely legal one, not abuse of discretion. A court, for example, does not have discretion to determine that conduct constituting fraud as a matter of law is not fraud. As in any appeal, of course, the ultimate legal conclusion may be based on subsidiary findings to which an abuse of discretion standard does apply. That relaxed standard would also apply to the ultimate ruling if the ruling is based on a finding that the movant did not exercise due diligence in light of the circumstances, for, ordinarily, that is a discretionary determination.

rolled judgments. Such an order is appealable as a final judgment, and it brings before the appellate court the merits of that judgment. *First Federated Com. Tr. v. Comm'r,* 272 Md. 329, 333, 322 A.2d 539, 542 (1974); *Ventresca v. Weaver Brothers, Inc.,* 266 Md. 398, 403, 292 A.2d 656, 659 (1972); *Mut. Benefit Soc'y v. Haywood,* 257 Md. 538, 540, 263 A.2d 868, 870 (1970). *See also Sisk v. Friendship Packers,* 326 Md. 152, 157–58 n. 3, 604 A.2d 69, 71–72 (1992).

## III. *DISCUSSION*

### A. *Statutory Procedure*

The procedure governing adoptions and guardianships that terminate parental rights is found in §§ 5–301 through 5–330 of the Family law article and in the implementing rules of this Court. The former rules were in Ch. 1100, subtitle D of the Md. Rules; they now comprise Rules 9–101 through 9–113.

■ We commence with Family Law article, § 5–311(a), which provides that a child may not be adopted without the consent of his natural parents unless the parental rights of those parents have been terminated by a judicial proceeding. It is common for the State, when it concludes that a continuing relationship between a child and his natural parents is likely to be harmful to the welfare of the child, to seek to terminate parental rights as an intermediate measure. A judgment terminating those rights not only eliminates the need for parental consent to a subsequent adoption but also provides the State with flexibility in seeking out adoptive persons or families and in caring for the child in the interim. Most States authorize this intermediate procedure. *See* Joan H. Hollinger, et al., ADOPTION LAW AND PRACTICE, § 4.04[1][a].

A judgment terminating parental rights may be entered upon the voluntary, affirmative consent of the natural parents if the action is filed under title 5, subtitle 3 of the Family Law

article.[6] Indeed, except as provided in §§ 5–313 and 5–313.1, a guardianship may not be entered without the consent of each living natural parent. *See* § 5–317(c); Md. Rule 9–102(a) (former Md. Rule D 73). Section 5–313 sets forth the circumstances under which a court may enter a judgment of guardianship without the consent, and even over the objection, of the natural parents; section 5–313.1 deals with foreign adoptions and guardianships. Neither section is directly relevant in these cases.

■ A parent's affirmative consent is not valid unless (1) it contains an express notice of the right afforded by § 5–317 to revoke the consent, and (2) if the parent is a minor, it is also accompanied by an affidavit of counsel that the consent is given knowingly and willingly. Fam. Law art., § 5–314.

The statute contemplates, and the rules (former Rule D 72 a.1.(g)); current Rule 9–103(b)(2)(A)(viii) and (c) require that a copy of any consent signed by a parent either accompany the DSS petition or be filed in court thereafter. At the time the petition was filed in Clemy P.'s case, § 5–317(e) allowed a consenting parent to revoke her consent at any time within the earlier of 30 days after the consent was filed in court or entry of the judgment of guardianship. As the result of a 1994 amendment, § 5–317(e) now limits the revocation period to 30 days after the consent is signed.

In cases in which the parent does not affirmatively consent to the guardianship, § 5–322(a) of the Family Law article requires that the court, upon the filing of a petition, enter and serve upon the parent a show cause order informing the parent of the petition. The rules extend the statute and require more detailed information. Former Rule D 74 (current Rule 9–105) required that a copy of the petition also be served on the parent and set forth a form of show cause order

---

6. We have recognized that the State must follow this statutory scheme if parental rights are to be terminated. *See Carroll County v. Edelmann,* 320 Md. 150, 170–76, 577 A.2d 14, 26 (1990) (precluding a court from terminating a parent's parental rights other than through this statutory scheme).

for the courts to use. The order explains in plain language that the parents have the right to object to the guardianship but that, if they wish to object, they must file their objection with the court by the date set forth in the order. In Clemy P.'s case, that date was June 25, 1993.

As we noted in Part I, the order tells the parents, in capital letters, that if they do not file a notice of objection by the stated deadline, a decree terminating their parental rights may be entered without their consent. As we further noted, a form notice of objection is appended to the show cause order, which also advises the parent of the need to file the notice before the stated deadline. The notice makes clear that the parent need do nothing more than sign the form and print his or her name, address, and telephone number in the places indicated and mail or deliver it to the court at the address shown.

Section 5–322(d) provides in relevant part:

"If a person is notified under this section and fails to file notice of objection within the time stated in the show cause order or if a person's notification has been waived under subsection (c) of this section:

(1) the court shall consider the person who is notified or whose notice is waived to have consented to the ... guardianship; and

(2) the petition shall be treated in the same manner as a petition to which consent has been given." [7]

Former Rule D 76.a. provided that a person having the right to notice of a guardianship proceeding may file an objection to the guardianship "[w]ithin the time specified in the show cause order." Rule D 77.a. did not make a hearing mandatory but stated only that the court "shall hold such hearing as justice may require." Current Rule 9–107(b)(1) requires that, if the show cause order is served within Mary-

---

[7]. The reference to subsection (c) has no application here. That subsection sets forth circumstances in which the show cause order need not be served on the parent—in which notice to the parent of the filing of the petition is deemed waived.

land, a notice of objection must be filed within 30 days after the show cause order is served. Rule 9–109(a) requires a hearing on the merits "in a *contested* guardianship action and in every adoption action." (Emphasis added). Rule 9–111(a) precludes a court from entering a judgment of guardianship before "[e]xpiration of the time for revoking all required consents."

## B. *The Parents' Position*

In the circuit court, Clemy P. attempted to relate the "deemed" consent under § 5–322(d) to an affirmative consent contemplated by § 5–317 and former Rule D 73, now expressly provided for by Rule 9–102. She argued that (1) if the judgment of guardianship was based on her "deemed" consent under § 5–322(d), she had a right under § 5–317(e) to revoke that consent at any time prior to entry of the judgment, (2) it was incumbent upon DSS as a matter of due process to inform her that she had that right and to give her notice of all proceedings and papers filed with the court prior to entry of the judgment so that she could effectively exercise her right to revoke, (3) she was not apprised of her right to revoke and was not given notice of DSS's motion for entry of the judgment or of the entry of the judgment, and (4) the judgment was therefore defective and invalid.

In this Court, the Public Defender presses that argument on behalf of Clemy P. but, in advocating the position of the parents in the three Baltimore City cases, has expanded it to include the filing of untimely objections prior to the entry of a judgment of guardianship. In that regard, he urges that (1) courts have discretion under Rules 1–204 and 2–613 to consider late-filed objections, and (2) to construe the law otherwise would cause it to constitute a violation of due process of law and equal protection of the law. That argument was not articulated by Clemy P. in her case in the circuit court.

## C. *Analysis*

### (1) *Question 2: Right To Revoke "Deemed" Consent*

The argument actually articulated by Clemy P. in the circuit court, which was accepted by that court, founders

on the erroneous assumption that underlies its major premise. Section 5–322(d) does not incorporate within it the provisions of § 5–317(e). A deemed consent under § 5–322(d) may not be revoked, for it is not a volitional consent but one arising by operation of law. If the parent fails to file a timely objection, no further notices need be given to the parent, prior to or upon the entry of a judgment of guardianship. This conclusion is clear from both the structure and the history of the relevant statutes and rules.

Before considering in further detail the current text of the statutes, we note that we have examined closely the legislative development of those statutes and of the rules implementing them. We have reviewed the 1982 general revision of the adoption and guardianship laws (1982 Md. Laws, ch. 514), the revision of the subtitle D Rules in 1983 and 1986, the amendments to § 5–322(d) made in 1987 (1987 Md. Laws, ch. 282), the amendments made to § 5–317(e) adopted in 1992 and 1994 (1992 Md. Laws, ch. 511; 1994 Md. Laws. ch. 234), and the most recent revision to the adoption and guardianship rules adopted by this Court in June, 1996, which took effect January 1, 1997. It is not necessary to prolong this opinion with a complete recitation of those various enactments and promulgations. It will suffice, to demonstrate the point, to focus on 1987 Md. Laws, ch. 282 amending § 5–322(d) and 1992 Md. Laws, ch. 511 and 1994 Md. Laws, ch. 234, amending § 5–317(e).

Until 1986, § 5–322(d), as supplemented by Md. Rule D 76, required a parent who wished to object to a DSS petition for guardianship to file a formal petition to intervene in the case and, if that petition was granted, to file an answer to the petition. In the 94th Report of this Court's Standing Committee on Rules of Practice and Procedure, filed in January, 1986, the Committee recommended, and this Court later adopted, rules that replaced the intervention scheme with a simple notice of objection and required the show cause order to give clear advice as to the necessity and manner of filing an objection and as to the consequence of failing to do so.

Apart from that change, the Rules Committee raised in its 94th Report the very issue underlying the questions presented here, pointing out that it was unclear from the existing statutes what the effect was of a parent refusing to consent but failing to object to a DSS petition. At the time, § 5–322(c) provided that, if a parent failed to intervene within the time specified, the court shall consider the "requirement of consent" by that person to have been waived. Even with the other changes recommended by it, the Committee urged in its Report that the failure to object not be treated as the effective equivalent of consent. In light of substantial opposition to that approach by various groups and certain other ambiguities in the statute, however, the Committee asked the Court to defer action on that recommendation, which we did.

The issue raised by the Rules Committee was presented squarely to the Legislature in its 1987 session through the introduction of HB 590, which was enacted as ch. 282. The bill was introduced at the behest of the Governor's Task Force To Study Adoption Procedures in Maryland. In its 1987 Report, the Task Force noted the increasing number of children "drifting" in foster care without any permanent home or family attachment. It pointed out that there were then 5,300 children in Maryland in the DSS foster care program, about 3,200 of whom had been in foster care for more than two years. GOVERNOR'S TASK FORCE TO STUDY ADOPTION PROCEDURES IN MARYLAND, GROWING UP ALONE: CHILDREN WAITING FOR FAMILIES vii (1987). DSS statistics showed that, State-wide, it took an average of 5.1 years for a child in foster care to be adopted. The delay in Baltimore City was even worse—an average of 7.4 years. *Id.* at viii.

The Task Force recommended 54 measures to speed up the process, one of which—Recommendation 6—was that, if a parent who was duly notified failed to file a timely objection to a DSS petition, "the petition shall be treated as one in which consent has been granted." *Id.* at 4. The consequence of failing to file a timely objection was thus to be changed from a waiver of the requirement of consent to a statutorily deemed consent. That recommendation was supported by the State

Department of Human Resources as a "clarification of legislative intent." In its written statement to the General Assembly, the Department observed that many parents, though recognizing that adoption would be in their child's best interest, were nonetheless unable to bring themselves to sign a consent to a termination of their parental rights but chose instead "to simply take no action when served with the show cause order—in effect, to 'allow their child to be taken from them.'" The Department expressed concern about continuing to treat such cases as contested, requiring full evidentiary hearings and delaying the termination process. The bill was also supported by several foster care review boards, which expressed similar concern over the delay in achieving permanence for children in foster care.

From this legislative history, it is evident that, in enacting HB 590, the General Assembly intended to eliminate any uncertainty over the effect of a parent's failure, after proper notice, to file a timely objection. The sole purpose of regarding such a lapse as a statutory consent imposed by operation of law and directing the court to proceed accordingly was to treat the case thereafter as though it were uncontested—to avoid the need for further notice and hearing and thus to speed up the judicial component of the permanency planning process.

That same purpose is equally clear in the 1992 and 1994 amendments to § 5–317(e). Until 1992, a parent who consented to a guardianship could revoke the consent at any time before judgment was entered. In 1992, the Legislature attempted to shorten that period by limiting the revocation period to the *earlier* of entry of judgment or 30 days after the consent was filed in court. 1992 Md. Laws, ch. 511. That was the law in effect when the petition was filed in Clemy P.'s case. In adopting that approach, the Legislature evidently believed that DSS would routinely file its petition almost immediately after obtaining the consent, that the consent would be filed with the petition, that the judicial action would proceed apace, and that the deadline for revoking the consent

would therefore expire approximately 30 days after the consent was signed, if not sooner upon the entry of judgment.

That assumption, however, turned out to be unwarranted, and thus the statutory scheme carried within it a serious deficiency. Evidence presented to the Rules Committee showed that, for a variety of reasons, DSS did not routinely file its petition immediately upon obtaining a consent. In many cases, there was a delay in obtaining the consent of the second parent, or that parent could not be located or would not consent. In some instances, there were simply bureaucratic delays. Whatever the reason, even the mere prospect that the petition would not be filed contemporaneously with the obtention of a consent made it impossible to inform the consenting parent, at the time he or she signed the consent, when the revocation period would expire. At the urging of the Rules Committee, the General Assembly amended the statute in 1994 to fix the revocation period, in all cases, to 30 days after the consent was signed. 1994 Md. Laws, ch. 234. That change created a fixed, ascertainable expiration date—one that would allow DSS, the court, and all other interested parties to rely on the consent once the 30-day period expired.

In light of this history, it is evident that any construction of § 5-317(e) or § 5-322(d) that would have the effect of engendering further delays or imposing additional impediments to achieving permanent and stable family settings for children placed in foster care, usually as the result of a CINA proceeding, would be flatly inconsistent with and antithetical to the clear legislative purpose, and is to be avoided unless absolutely required.

■ As noted, § 5-317(e) permits a parent to revoke an actual, written consent at any time up to 30 days after the consent is signed. The right to revoke ends upon the expiration of that period. Unless the parent, in the consent, has expressly reserved the right to notice, he or she is not entitled to any notice of the petition or of any proceedings on it, including entry of a judgment, for the consent has made the case an uncontested one with respect to that parent. The only

further notice to which such a parent is entitled, unless it too has been waived, is that provided for in § 5–319(b)—that a placement for adoption has not been made within nine months after the judgment of guardianship, that a placement made within the nine months has been "disrupted," as defined in the statute, or that a judgment of adoption has not been entered within two years after a placement.

The revocation period allowed under § 5–317(e), as it now reads, is clear, fixed, and easily ascertained. The certainty of the period is essential for DSS and the court to know what, if any, right to notice and participation the parent retains. That certainty would not exist if a right to revoke is attached to the "deemed" consent under § 5–322. Under the theory espoused by Clemy P., the right to revoke the statutory consent would continue until the entry of judgment, which is an approach expressly rejected by the Legislature in 1992 and 1994 with respect to consents under § 5–317(e). It would also have the effect of giving a defaulting parent greater rights than one who affirmatively consents, and no rational justification for that has been proposed.

We can find nothing in the legislative history of the 1987 enactment, which put § 5–322(d) into its present form, suggesting an intent to attach a right to revoke to the statutory consent. As we indicated, the evident purpose for that approach was narrow and restrictive rather than expansive—to cut off the right of a parent who fails to file a timely objection to any further notice and any right to participate in the action. Indeed, that parent has fewer, not greater, rights than the parent who signs a written consent, for the latter is expressly authorized to retain the right at least to notice of further proceedings, though not the right to participate in them.[8]

---

**8.** As noted, when DSS filed its petition in Clemy P.'s case, the 1992 law was in effect. That is of no assistance to her, however, for the same principle applies. If Clemy had given an actual consent under § 5–322(c), it would have been filed with the DSS petition, as required by the rules, and thus would have expired in May, 1993. The show cause order set a deadline of June 25, 1993 to file an objection, and thus the "deemed" consent occurred then. Even if we were to accord her the

Adoption of Clemy P.'s view would render § 5–322(d) essentially meaningless, for, if the parent is allowed to ignore the plain advice and warnings in the show cause order and proceed to challenge the DSS petition at any time up to the entry of judgment (and perhaps even during the 30–day post-judgment period when the court retains full discretion under Md. Rule 2–535(a) to vacate the judgment), prudence would dictate that every case not based on actual consents obtained under § 5–317 be treated as contested.

As a matter of statutory construction, therefore, we conclude that there is no right to revoke a statutory consent arising under § 5–322(d). That is a consent, as we have said, arising by operation of law, not by volition, and it is not within the power of the parent to revoke it.

### (2) *Question 3: Right To Notice*

Because there is no right to revoke a consent arising under § 5–322(d), it follows that the consent becomes fully effective when the time for filing an objection expires. Thereafter, as to the non-objecting parent, the case becomes uncontested, in the same manner as to a parent who has consented under § 5–317 without reservation and has allowed the revocation period to lapse. Such a parent is entitled to no further notice of proceedings on the DSS petition and has no further right to participate in the action. Moreover, because there is no right to revoke such a statutory consent, it is not incumbent on DSS, or anyone else, to inform the parent that he or she has such a right. The advice and warnings contained in the show cause order adequately explain the effect of a failure to file a timely objection. No other advice is required. Because, in Clemy P.'s case, the motion to vacate the guardianship judgment and the order granting that motion were based solely on the ground that Clemy P. had a right to

---

same 30–day period allowed under § 5–317(e), as it read in 1992, she would have had only until July 25, 1993 to revoke. The judgment was entered October 20, 1993, after any equivalent right to revoke would have expired. Even the DSS motion for judgment, of which she complains she received no notice, was filed after October 11.

revoke her statutorily deemed consent, we shall reverse the order as being legally unfounded.

### (3) *Caveat*

We indicated in the introduction to this opinion that our answer to the second question raised in the *certiorari* petition was "no" with a caveat. The caveat arises from a statute that we mentioned in passing but which was not raised by Clemy P. or any of the other petitioners, either in the circuit court or in this Court. It has no relevance to the first four cases but could have relevance in Clemy P.'s case.

Section 5–319 of the Family Law article, as noted, requires that DSS file a report if an adoption placement is not made within nine months after entry of the guardianship judgment, if a placement made within that period has been disrupted, or if an adoption does not take place within two years after placement. If any of those circumstances exist, the statute requires the guardian to send notice of the child's status to the natural parents. More significantly, § 5–319(f) provides that, on receipt of the guardian's report and every 12 months thereafter, the court

"(1) shall hold a hearing to review the progress which has been made toward the child's adoption and to review whether the child's current placement and circumstances are in the child's best interest; and

"(2) *shall take whatever action the court considers appropriate in the child's best interest.*"
(Emphasis added).

The issue of whether § 5–319(f) would allow the court to reopen or vacate an enrolled judgment of guardianship in the limited circumstances enumerated in the statute was not included in the petition for *certiorari* and was not briefed or argued in this Court. It is not clear whether it was considered below. As noted, counsel for the children asked for a hearing because of the delay in placing them for adoption and Clemy P. sought to intervene in that proceeding, but the record before us is silent both as to what happened in that

regard and as to whether that circumstance in any way influenced the court in its decision to vacate the guardianship judgment. The court made no mention of § 5–319(f) in its order vacating the guardianship, which was based solely on the court's erroneous conclusion that Clemy P. had a right to notice of all pleadings filed after the deadline passed for her objection.

It would be inappropriate for us to consider and construe § 5–319(f) in this case. We simply call it to the attention of the bar, the bench, and especially to DSS.

### (4) *Question (1): Authority To Consider Untimely Objection*

#### (a) *Mootness*

We turn, finally, to the moot question presented in the three Baltimore City cases—whether the court has authority to accept and consider an objection filed after the deadline set in the show cause order. We have made clear many times that, while we have the Constitutional authority to express our views on moot questions, we exercise that authority "only in rare instances which demonstrate the most compelling of circumstances." *Reyes v. Prince George's County,* 281 Md. 279, 297, 380 A.2d 12, 27 (1977); *Mercy Hosp., Inc. v. Jackson,* 306 Md. 556, 562, 510 A.2d 562, 565 (1986); *Baltimore Sun Co. v. State,* 340 Md. 437, 454, 667 A.2d 166, 174 (1995). We have addressed moot questions when "the public interest clearly will be hurt if the question is not immediately decided," if the issue is "likely to recur frequently, and its recurrence will involve a relationship between government and its citizens," and if "the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision." *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379, 382 (1954); *Mercy Hosp., supra,* 306 Md. at 563, 510 A.2d at 565; *Coburn v. Coburn,* 342 Md. 244, 250, 674 A.2d 951, 954 (1996); *In re Riddlemoser,* 317 Md. 496, 502–03, 564 A.2d 812, 815 (1989).

This is one of those rare situations. The issue is obviously of considerable public importance; given the number

of termination cases filed each year, the issue is likely to recur frequently;[9] it involves an important and dramatic conflict between the government, acting as *parens patriae,* and the most fundamental rights of individual citizens as parents; and there are significant practical difficulties in effectively and efficiently presenting this issue, which necessarily arises from an interlocutory order, for appellate review.

The Public Defender does not suggest that there is any internal ambiguity in § 5–322(d). That section states quite clearly that, if the parent is properly notified and fails to file an objection "within the time stated in the show cause order," the parent is deemed to have consented to the petition. His argument is two-fold. First, he contends that § 5–322(d) must be read in conjunction with Rules 1–204(a) and 2–613, which, respectively, allow a court to extend a filing deadline and to strike an order of default entered upon a party's failure to file a timely responsive pleading, and that, when so read, the court has discretion to accept a late-filed objection. Second, he argues that, if the statute is not read in that manner, it denies parents due process of law and equal protection of the law. We find no merit in either argument.

### (b) *Rules 1–204 and 2–613*

Rule 1–204(a) states, in relevant part, that

"[w]hen *these rules or an order of court* require or allow an act to be done at or within a specified time, the court, on motion, may (1) shorten the period remaining, (2) extend the period if the motion is filed before the expiration of the period ... or (3) on motion filed after the expiration of the specified period, permit the act to be done if the failure to act was the result of excusable neglect."

(Emphasis added). It is only the third clause that is potentially applicable here, as no motion to extend the deadline was filed prior to its occurrence.

---

**9.** The 1995–96 Annual Report of the Maryland Judiciary indicates that, in FY 1996, 2,895 petitions for adoption or guardianship were filed.

The Public Defender's argument pertaining to Rule 1–204 overlooks the fact that the time period for filing an objection is defined and mandated by *statute,* not by the rules or by order of court. It is true that former Rule D 76 a. parroted the statutory requirement that an objection be filed "[w]ithin the time specified in the show cause order," but that does not alter the fact that the period was established by statute, rather than by rule or court order.[10] Rule 1–204(a) therefore does not apply.

Nor does Rule 2–613 apply in this case. Section (a) of that rule permits a court to enter an order of default "[i]f the time for *pleading* has expired and a defendant has failed to *plead* as provided by these rules...." (Emphasis added). Section (b) directs the clerk to notify the defendant that such an order has been entered. Section (c) permits the defaulting defendant to move to vacate the order within 30 days after its entry, and § (d) directs the court to vacate the order if it finds that "there is a substantial and sufficient basis for an actual controversy as to the merits of the action and that it is equitable to excuse the failure to plead...."

Rule 2–613 is based on a default in *pleading.* Rule 1–202(r) defines "pleading" as "a complaint, a counterclaim, a cross-claim, a third-party complaint, an answer, an answer to a counterclaim, cross-claim, or third-party complaint, a reply to an answer, or a charging document as used in Title 4." A notice of objection is none of those things. One of the major changes made in the rules in 1986 was to convert the requirement of a petition to intervene and an answer into a simple notice of objection. The objection need not state any defenses *to the petition and need not admit or deny any of the* allegations made by DSS, as would be required in an answer.

---

**10.** New Rule 9–107(b) is consistent, though worded differently. As noted, it requires that an objection be filed within 30 days after the show cause order is served. Rule 9–105, which sets forth the form of show cause order, requires that the order specify that the objection must be filed within that period. Thus, the new rule continues to carry forth the statutory mandate that the objection be filed within the time stated in the show cause order.

*See* Md. Rule 2–323. Nor need the parent serve the objection on DSS, as would be required if the objection were regarded as a pleading. *See* Md. Rule 1–321. Apart from the objection not being a pleading, no order of default is entered if an objection is not filed; there is, accordingly, no order to vacate. As with Rule 1–204, Rule 2–613 has no application to this procedure.

### (c) *Due Process*

The Public Defender's due process argument springs from the fundamental liberty interest that parents have to raise their children, articulated in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Noting that, under Rule 1–204(a), courts have discretion generally to excuse late filings, he urges that the removal of such discretion in termination cases, regardless of the circumstances, "is shocking to the conscience and violative of the right of due process."

*Lassiter, Santosky,* and their progeny recognize three basic principles: (1) parents have a fundamental liberty interest in the care, custody, and management of their children, (2) when the State moves to abrogate that interest, it must provide the parents with fundamentally fair procedures, and (3) the process due to parents in that circumstance turns on a balancing of the three factors specified in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), *i.e.*, the private interests affected by the proceeding, the risk of error created by the State's chosen procedure, and the countervailing governmental interest supporting the use of the challenged procedure.

The first and third *Mathews* factors are obviously important ones in a termination of parental rights action. The private interest is the parent's fundamental right to raise his or her children, and there are few, if any, rights more basic

than that one. The governmental interest in securing permanent homes for children placed into its custody because of an inability or unwillingness of their parents to care for them properly is also strong and vital, however. These are vulnerable and defenseless children, usually at critical stages of their development and having only the government and its agents to turn to for physical and emotional sustenance. Once it appears that reunification with their parents is not possible or in their best interest, the government has not only a special interest, but an urgent duty, to obtain a nurturing and permanent placement for them, so they do not continue to drift alone and unattached.[11] *Compare M.L.B. v. S.L.J.,* —— U.S. ——, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), where the countervailing governmental interest found wanting was only a financial one.

With two strong countervailing interests here, the pivotal issue is the second—the risk of error created by the challenged procedure.

 In this regard, the Public Defender conjures up the prospect of a mother who lapses into a coma upon receipt of the show cause order and is, for that reason, rendered unable

---

11. The problems facing these children and the need to find permanent homes for them with reasonable dispatch were set forth in the 1987 Report of the Governor's Task Force To Study Adoption Procedures in Maryland, *supra.* The Commission noted, at iii:

"As a result of the dramatic decrease in the number of healthy infants and toddlers available for adoption, the overwhelming majority of children receiving adoption services today have very special needs. They are school-aged; they have severe and demanding mental and emotional conditions which will require extensive ongoing care and treatment and may prevent future self-sufficiency. Services needed include recruitment and assessment of adoptive families, preparation of children and families for adoption placement, pre and post-placement services and post finalization services to adoptive families.... Older children who have experienced living with a number of families require extensive preparation and work around issues of grief before they can accept an adoptive family and trust that this placement will be permanent....

"At public hearings held by the Task Force, adoptive parents spoke of the severe emotional problems of the children who came to them after years in the state's foster care system."

to file a timely objection. Something so extreme as that might indeed present a due process problem in the particular application of the statute, but the attack here is a frontal one, and, in that context, the risk of error factor is not to be judged by the remote, extreme case that, to the best of our knowledge, has never yet happened and is not ever likely to happen. None of the parents in the three Baltimore City cases, in which this issue was raised, offered any excuse beyond mere neglect for failing to file a timely objection. *Compare Matter of K.B.E. and T.M.E.*, 740 P.2d 292, 296–97 (Utah.Ct.App. 1987); *Application of S.R.S. and M.B.S.*, 225 Neb. 759, 408 N.W.2d 272, 278 (1987); *Adoption of Kassandra B. v. Martin G.*, 3 Neb.App. 180, 524 N.W.2d 821, 827 (1994). In judging the facial validity of the procedure, we must look to the normal case, not to a conjured, hypothetical aberration.

We cannot say that there is *no* risk of error in an absolute deadline, but zero tolerance is not required and is probably not achievable in any procedure. The statutory deemed consent does not exist in a vacuum. It arises only after service on the parent of a show cause order that explains, in plain, simple language, the right to object, how, where, and when to file a notice of objection, and the consequence of not filing one within the time allowed. A form notice of objection is attached to the order, and all that the parent need do is to sign it, print on it his or her name, address, and telephone number, and mail or deliver it to the address shown in the order. If, as in each of the cases before us, the children have already been declared to be CINA, a copy of the order is also served on the attorney who represented the parent at the CINA proceeding. The order states clearly that the parent has a right to an attorney and may have the right to a court-appointed attorney, and there is a clearly marked space on the objection form for the parent to exercise that right. Each of the parents now before us had several weeks after service of the order within which to file an objection; current Rule 9–107(b) requires the objection to be filed within 30 days after service of the show cause order.

In this setting, we believe that the risk of error in establishing an absolute deadline for filing a notice of objection is relatively small. It is evident to us that, in the normal case and in the cases now before us, the parent is given fair and adequate notice of what is required and a fair and adequate opportunity to file a timely notice of objection. It is, perhaps, noteworthy that, in two of the Baltimore City cases, the late-objecting parent did not even show up at the hearing on the merits.

Balancing the three *Mathews* factors, therefore, we conclude that the statutory scheme of regarding the failure to file a timely objection as an irrevocable deemed consent to the petition does not facially offend any due process right of the parent.

### (5) *Equal Protection*

The Public Defender's equal protection argument proceeds from a comparison of the parent who suffers from a deemed consent under § 5–322(d) with (1) an ordinary civil litigant, whose late filings may be accepted by the court under Rule 1–204, and (2) the parent who signs an affirmative consent and has 30 days within which to revoke it. He urges that, because a fundamental right is at stake, these comparisons must be subjected to a strict scrutiny analysis and that there is neither a necessity nor a compelling State interest in treating the parent who fails to file a timely objection differently.

We shall assume, for purposes of this appeal, that the deemed consent under § 5–322(d) is subject to a strict scrutiny analysis, although it is not necessary that we so hold. A statutory classification impinging upon a fundamental right "must be narrowly tailored to serve a compelling governmental interest." *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 666, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652 (1990); *Verzi v. Baltimore County,* 333 Md. 411, 418, 635 A.2d 967, 970 (1994); *Kirsch v. Prince George's County,* 331 Md. 89, 98, 626 A.2d 372, 376, *cert. denied,* 510 U.S. 1011, 114 S.Ct. 600,

126 L.Ed.2d 565 (1993); *Murphy v. Edmonds,* 325 Md. 342, 356, 601 A.2d 102, 109 (1992).

We have already elucidated the governmental interest underlying § 5–322(d) and need not repeat it. It *is* a compelling interest. The question, then, is whether the device of a statutorily deemed irrevocable consent is narrowly tailored to serve that interest. We have no hesitation in concluding that it is.

In the normal civil case, the governmental interest is limited to providing a neutral forum and fair procedures for the efficient resolution of the dispute. Deadlines for the filing of lawsuits and for the filing of pleadings and other papers in lawsuits that have been filed serve only that general interest, and escape hatches, such as provided for by Rule 1–204(a), are simply part of the established dispute resolution process. In termination of parental rights cases, the government has a special, more particular interest in the speedy resolution of DSS petitions. The Legislature has made manifest its concern over children lingering in foster care, even during the judicial phase of the permanency planning process.

As we indicated above, if the court had the general discretion to accept and consider a late-filed objection, no one could safely rely on the absence of a timely objection. A parent who, out of negligence or deliberation, allows the time for objection to lapse and later has a change of heart, would be able to seek the opportunity to object at any time prior to entry of judgment, and possibly even for 30 days thereafter. Under the Public Defender's view, parents would presumably have to be told that they have that ability, which would tend to make untimely objections even more frequent. Giving the parent fair notice, warning, and opportunity to object, coupled with a clear, irrevocable deemed consent if a timely objection is not filed, is a narrowly tailored device reasonably designed to serve the compelling governmental interest.

The different status of a parent who signs an affirmative consent does not alter that conclusion. As we noted, such a consent is a volitional act. Allowing the parent 30 days to

revoke that consent does not significantly impede the process. Those consents are usually obtained before the petition is filed, for they must accompany the petition. Even if DSS files its petition before the revocation period expires, that period will necessarily expire before the action proceeds very far. Allowing a reasonable period to revoke an actual consent does not, therefore, present the same delays and uncertainties as allowing an escape from the failure to file a timely objection.

For these reasons, even under a strict scrutiny analysis, we find no denial of equal protection of law in regarding the consent arising under § 5–322(d) as irrevocable and not allowing the court routinely to entertain late-filed objections.

APPEALS IN NOS. 93321055, 95089042, AND 95108035 DISMISSED, COSTS TO BE PAID BY APPELLANTS; JUDGMENT IN NOS. 11711 AND 11712 AFFIRMED, COSTS TO BE PAID BY APPELLANTS; ORDER VACATING JUDGMENT IN NOS. 11387 AND 11388 REVERSED, THOSE CASES REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR ENTRY OF ORDER DENYING MOTION TO VACATE AND REINSTATING JUDGMENT OF GUARDIANSHIP, COSTS TO BE PAID BY APPELLEE.