786 A.2d 803

In re **ADOPTION/GUARDIANSHIP NOS. T00130003 AND T00130004 IN THE CIRCUIT COURT FOR BALTIMORE CITY.**

No. 364, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 6, 2001.

Joan Little (Rachel Markowitz, on the brief), Baltimore, for appellants.

C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., SALMON, and RAYMOND
G. THIEME, Jr. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge (Retired, Specially
Assigned).

On May 15, 2000, the Baltimore City Department of Social
Services (the Department) filed a Petition for Guardianship
with the Right to Consent to Adoption or Long Term Care
Short of Adoption for the minor children, Dontae and Latisha
W. The Petition, filed in the Circuit Court for Baltimore City
Division for Juvenile Causes, requested that the children be
placed with a relative. Carol W., the mother of the children,
filed an objection to the Petition on May 30, 2000. Counsel for
the children filed no objection and were thus deemed to have
consented to the Petition.

Despite the Department's intention to have the children
placed with a relative, as of January 2001 the children were
still in foster care. Consequently, the children were granted
an extension of time for discovery, and the court ordered
evaluations be conducted by the Juvenile Court Medical Ser-
vice Office prior to the settlement conference scheduled for
February 2001. Based on purported changes in circumstances
that occurred after the Petition was served, the children
further sought the opportunity to file an objection to the
Petition after the deadline had passed. This request was
denied. Consequently, during the trial held on March 29,
2001, the children were not given the opportunity fully to
present a case. The Department's Petition was granted and
Carol W.'s parental rights were terminated.

The children subsequently filed this appeal on April 24,
2001, to raise the following questions:

I.     Did the circuit court err in refusing to consider
       whether the children's changed circumstances war-
       ranted relief from the thirty-day response deadline to
       the show cause order?

II.    Did the circuit court abuse its discretion in failing to
       consider evidence in the Court Medical reports indi-

cating the inappropriateness of the termination of parental rights of Carol W. and the significance of the sibling bond between Latisha and Dontae?

III.  Did the circuit court err in concluding that Latisha and Dontae's best interests called for the termination of Carol W.'s parental rights?

*Facts*

Latisha W, now eleven years old, was born on December 1, 1989 to Carol W. Latisha's father died on September 4, 1989, prior to her birth. Latisha lived with her mother and two siblings, Tylita R. and Ashley M.,[1] until April 1993 when Carol W. was hospitalized after an attempted suicide. At that time Latisha went to live with Ashley M. and her father, Russell M.

The Department provided a great deal of supportive services to Carol W. and her family. Such measures included the purchase of food and clothing, in-home aide, and the location of an apartment with the initial payment of rent and the identification of potential employment. The Department also placed Carol W. in a drug treatment program. Carol W., however, did not follow through to obtain employment and failed to pay rent, which led to her eviction. She also continued to abuse drugs and was dismissed from the drug treatment course because of her failure to keep several appointments.

On December 14, 1993, pursuant to petitions by the Department, Latisha was found to be a Child in Need of Assistance (CINA) and was formally placed in the custody of Russell M. and his wife.

Dontae W., now five years old, was born on October 17, 1995, to Carol W. His father was never identified.[2]  On

1.  Currently, Ashley M. resides with her father, and Tylita R. resides with her maternal grandmother. The Department of Social Services did not seek to terminate Carol W.'s parental rights as to these two children.

2.  Two men were identified as the possible father, but both were ruled out as candidates after paternity tests were conducted.

December 19, 1996, the Department filed a petition to have Dontae placed into shelter care. Additionally, as Latisha had been living alternately between Russell M. and Carol W., contrary to the December 14 order, the Department filed a Petition for Review as to Latisha's disposition. In making these petitions, the Department charged that Carol W. was providing inadequate care for the children [3] and further alleged that on one occasion she had struck Latisha with a belt. Carol W. was arrested and incarcerated until March 29, 1997 as a result of the abuse. The children were placed in the foster care of one Ms. H. while determinations as to their continued living situations were pending.

On May 7, 1997, the court found Dontae to be a CINA and granted a general order of commitment to the Department. The court also rescinded the Order of Custody and Guardianship to Russell M. and his wife as to Latisha and granted a general order of commitment to the Department. At this time, Carol W. also informed the court that she had a hearing scheduled because of a violation of her probation and expected to have an extended incarceration. Consequently, the children remained in the care of Ms. H., though a stipulation was made that the children were to have regular visitation with their mother.

The children have remained in occasional contact with Carol W. despite the fact that she had been incarcerated until January 2, 2001. Though the children were able to visit their mother three times a year, their current caseworker was present for one visit in 1999 and noted that Latisha did not interact well with Carol W. and Dontae did not appear to recognize her.

---

**3.** A police officer investigating a report of abuse found Carol W.'s home to be unsanitary and unsafe for the children. The officer indicated that the home was infested with rats, floorboards were loose, trash was spread throughout and the bathroom was unclean. The Department also received reports that the children, on at least one occasion, had been left without proper supervision.

Carol W. has made efforts to rehabilitate herself while incarcerated. She has taken various courses on addiction education, life skills and parenting, conflict resolution and even received her high school diploma. After her release, on January 5, 2001, she went to the Department and signed a service agreement to give her a second chance at raising her children. In doing so, she agreed to obtain housing, provide proof of employment and enroll in drug treatment.

Carol W. visited the children once following her release. During that visit, Dontae did not recognize Carol W. and instead identified Ms. H. as his mother. Another visit was scheduled by the caseworker for February, but Carol W. did not appear, nor did she make any efforts to reschedule the appointment. When the caseworker sought to contact Carol W., it was discovered that the phone had been disconnected.

At the time of the trial on March 29, 2001, Carol W. had not begun to comply with any of the provisions of the service agreement, nor did she have further contact with the children. This failure was emotionally damaging to Latisha.

On February 21, 2001, at the request of the children's counsel, the court ordered that Carol W. and the children attend a bonding assessment. The assessment was scheduled for March 13 2001. Notice was sent to Carol W. by her counsel, but she did not attend or respond in any manner. The assessment therefore evaluated the children individually, and a report was subsequently prepared by the Juvenile Court Medical Office (Medical Office).

The Medical Office concluded that Latisha had a very clear understanding of her situation. She expressed a desire to live with her mother, whom she loves, but only if Carol W. could be responsible. When asked what she would wish to do until her mother reaches such a point, Latisha responded that she would like to live with Russell M., whom she considers her stepfather. Though she stated that she loves Ms. H., she explained that she had more fun with Russell M.

The examiner indicated that Latisha and Dontae are very closely bonded. Latisha stated that she takes care of Dontae

including making sure he brushes his teeth, making sure he is fine while in school, and walking him home after school. The examiner expressed concern, as Latisha stated corporal punishment is used on Dontae.

The report further noted that Latisha is well adjusted, though she may benefit from increased social interactions. The Medical Office also recommended that Latisha remain with Ms. H. in long term care. The report concluded by recommending against the termination of Carol W.'s parental rights, as it was suggested that such an action could be emotionally damaging to Latisha, who has not yet resolved the fact that she may never be able to return to her mother's care.

The assessment of Dontae disclosed that he is well adjusted and extremely bonded to his foster mother, Ms. H., his sister Latisha, and his foster sisters. Despite previous contact with Carol W., Dontae does not seem to know who she is and only considers Ms. H. to be his mother. The report noted that Ms. H. has shown interest in adopting Dontae. The only area of concern that was presented was the apparent corporal punishment of Dontae by Ms. H. and his older foster siblings. The Medical Office nonetheless recommended that Dontae remain in the home of Ms. H. with his sister and that counseling be sought to find alternatives for corporal punishment.

On June 10, 1998, when the permanency plan for Dontae and Latisha was first established, the Department sought to have the children placed with a relative, and the circuit court ordered the Department to investigate relative resources for the children. On July 14, 2000, a court order incorporated an agreement between all the parties to transition the children to the home of a maternal aunt for an eventual adoption. This agreement was conditioned on a Department background investigation of the aunt. By January 24, 2001, however, the children had still not been placed with a relative. This failure also led to a contested CINA proceeding.

The court decided to consolidate the CINA and parental termination proceedings and set a trial date for March 29, 2001. On that date, however, the court held a trial on the

termination proceedings but chose not to proceed on the CINA review. The CINA review was later canceled, as it was not necessary to decide the issue after Carol W.'s parental rights were terminated. Carol W. had ceased communicating with her attorney since her release from prison in January and did not attend the trial although her attorney had sent her written notice of the date.

At trial, the court did not allow the children to present a complete case. Despite this deficiency, the court concluded that Latisha and Dontae's needs were being met and their safety was being provided for in the foster home. The court further concluded that Carol W. could not properly care for the children. Though a bond did exist between Latisha and her biological mother, the court concluded that it was not a true mother/child bond. Indeed the court pointed out that Carol W. has shown little interest in contacting her children. Instead the court noted that the children have adapted reasonably well to their foster home. Thus, the court decided it was in the best interest of the children to terminate Carol W.'s parental rights. The court further noted that counsel for the children did not file a timely objection, and thus the consent of the children was assumed.

The children subsequently filed this appeal.

## Discussion

### I. Relief from the Deadline

Maryland Rule 9–107(b)(1) requires that a notice of objection to a petition for adoption or guardianship be filed within thirty days after the show cause order is served. Md. Code (1984, 1999 Repl. Vol.), § 5–322(d) of the Family Law Article ("FL") provides that consent to such orders is assumed absent the filing of an objection. Despite these statutes, appellants argue that there are rare situations in which changed circumstances require a trial court to consider whether an untimely objection is appropriate to protect the best interests of the children. Appellants contend that the circuit court erred in failing to consider whether such an objection could be appro-

priate in this case and thus erroneously subordinated the best interest of the children to the mechanical application of a procedural rule.

Appellants urge that the circumstances surrounding this case lend themselves to a reconsideration of the matter on a best interest of the child test. Specifically, appellants note that almost a year elapsed between the date the show cause order was received by appellants' counsel and the date of the termination hearing. Appellants note that at the time the show cause order was received the Department's intent was to have the children transitioned into the care of a maternal aunt for adoption. Appellants argue that the decision not to object to the permanency plan and termination of parental rights was based on the agreement that a relative was to adopt the children. As this perceived contingency has not been met, appellants believe a material change in circumstances has occurred that should allow the court to reassess the best interests of the children. Appellants further proffer that the children have matured since the time the show cause order was received, and as a result the children are now more capable of expressing their opinions and making a decision on the matter.

In requesting a review of the circuit court's actions, appellants note that Maryland courts have occasionally abandoned strict applications of statutory deadlines when those deadlines would conflict with the purpose of the statute. Appellants rely on *In re Anthony R.*, 362 Md. 51, 763 A.2d 136 (2000), to present the proposition that courts should examine the "totality of the circumstances and the facts of each case to determine the sanction for noncompliance with [a] statute." *Id.* at 55, 763 A.2d 136. Though appellants concede that noncompliance with a statutorily established deadline supported a mandatory dismissal in *In re Anthony R.*[4], they point to other cases that have led to differing results based on statutory goals.

---

4. *Anthony R.* dealt with a delinquency proceeding under the Juvenile Causes Act. The Court concluded that an important purpose of the act included the protection and rehabilitation of juveniles as well as speedy

Appellants cite *In re Keith W.*, 310 Md. 99, 527 A.2d 35 (1987), as an example where the Court of Appeals ignored a statutory requirement in order to support the Juvenile Causes Act's purpose of rehabilitating and treating delinquent juveniles. In that case, the State filed a juvenile petition charging a minor with possession of marijuana with intent to distribute. Maryland's juvenile law required that an adjudicatory hearing be held within sixty days of the petition's service. Though an extension may be granted under the statute for extraordinary cause, the State requested and was granted an extension without such a showing. *Id.* at 102, 527 A.2d 35. Thus, the State did not comply with the statute, and a dismissal was requested by the minor. In denying the dismissal, the court opined that such a sanction was inappropriate under the totality of the circumstances surrounding the case. *Id.* at 109–10, 527 A.2d 35. In making this decision, the court relied heavily on the statutory purpose of rehabilitating delinquents. *Id.* at 104–07, 109, 527 A.2d 35.

Appellants further rely on this Court's decision in *In re Abiagail C.*, 138 Md.App. 570, 772 A.2d 1277 (2001), to contend that statutory deadlines may be ignored when blind adherence would thwart the purpose of a statute. The appeal in *Abiagail C.* centered around a circuit court decision to terminate parental rights despite the fact that the ruling was made after a statutory time limit had run. FL § 5–317(d) requires that rulings on petitions for guardianship or adoption be made within 180 days of the filing of the respective petition. Though appellant, the biological mother of Abiagail, argued that such a failure required dismissal, this Court disagreed. We noted that the purpose of adoption and guardianship laws were to further the best interest of the child. *In re Abiagail*

---

trial considerations. *In re Anthony R.*, 362 Md. at 59–65, 763 A.2d 136. As a result of this goal, the statute created a mandatory time limit that could only be extended for a showing of good cause. *Id.* at 66, 763 A.2d 136. The Court did, however, note that a totality of circumstances analysis was inappropriate in deciding that case. Thus, after reviewing the statutory purpose, the Court remanded the untimely filed case so that it could be dismissed for failure to comply with the statute. *Id.* at 76, 763 A.2d 136.

*C.,* 138 Md.App. at 586, 772 A.2d 1277. Amendments made by the General Assembly, including § 5–317(d), were aimed at "speeding up the guardianship and adoption process so that children no longer would be consigned to foster care limbo for years." *In re Abiagail C.,* 138 Md.App. at 584, 772 A.2d 1277 (citing *In re Adoption/Guardianship No. 93321055,* 344 Md. 458, 482–83, 687 A.2d 681 (1997)). We concluded that a mandatory construction of FL § 5–317(d) requiring dismissal would only increase such delays by necessitating an entirely new action. *Id.* at 586, 772 A.2d 1277. Consequently, we refused to interpret the statute in a manner inconsistent with the statutory purpose.

The Court of Appeals has recently reaffirmed the well settled canons of statutory interpretations in *Mid–Atlantic Pwr. Supply Assoc. v. PSC,* 361 Md. 196, 203–04, 760 A.2d 1087 (2000):

> in pursuing the real goal of statutory interpretation, the discernment of the intent of the Legislature, we begin our inquiry with the words of the statute and, when they are clear and unambiguous, we end it there, as well.

*Id.* (quoting *Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987 (2000)); *See also Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999). In considering the language of the statute, we shall give words their ordinary and natural meaning. *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998) (citing *Gardner v. State,* 344 Md. 642, 647–48, 689 A.2d 610 (1997)). The natural meaning of the statute, however, is not necessarily the final word in our interpretation. Instead, we must construe the statute reasonably in reference to the purpose or ends sought by the legislature. *Langston v. Riffe,* 359 Md. 396, 410, 754 A.2d 389 (2000) (quoting Tracey v. Tracey, 328 Md. 380, 387, 614 A.2d 590 (1992)). Often, this will necessitate an examination of the legislative history and other sources for a more complete understanding of the legislature's intentions in enacting particular legislation. *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993). In so doing, "we may also consider the particular problem or prob-

lems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987) (citing *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 517 A.2d 730 (1986); *Bledsoe v. Bledsoe,* 294 Md. 183, 448 A.2d 353 (1982)). In making such an interpretation, we must attempt to harmonize statutes regarding the same subject to the greatest extent possible. *Mid–Atlantic Pwr. Supply Assoc. v. PSC,* 361 Md. 196, 204, 760 A.2d 1087 (2000) (citing *GEICO v. Insurance Comm'r,* 332 Md. 124, 131–32, 630 A.2d 713 (1993)). In interpret a statute, we avoid "giving the statute a strained interpretation or one that reaches an absurd result." *Metheny v. State,* 359 Md. 576, 610, 755 A.2d 1088 (2000) (citing *Huffman,* 356 Md. at 627–28, 741 A.2d 1088).

With these postulates to shepherd us, we will scrutinize the language of FL § 5–322(d):

*Failure to respond or waiver of notification.*—If a person is notified under this section and fails to file notice of objection within the time stated in the show cause order or if a person's notification has been waived under subsection (c) of this section:

(1) the court shall consider the person who is notified or whose notice is waived to have consented to the adoption or to the guardianship; and

(2) the petition shall be treated in the same manner as a petition to which consent has been given.

Maryland courts have had copious opportunities to dissect the word "shall." Indeed, the Court of Appeals has stated, "[u]nder settled principles of statutory construction, the word 'shall' is ordinarily presumed to have a mandatory meaning." *In re Anthony R,* 362 Md. at 60, 763 A.2d 136 (citing *Johnson v. State,* 282 Md. 314, 321, 384 A.2d 709 (1978); *Moss v. Director,* 279 Md. 561, 564–65, 369 A.2d 1011 (1977); *United States Coin & Currency v. Director of Finance of Baltimore City,* 279 Md. 185, 187, 367 A.2d 1243 (1977)). Despite this presumption, this Court noted in *In re Abiagail C.:*

Depending on the context, placement, and use of the word "shall," and the nature of the constitutional provision or statute in which it appears, the word may have a mandatory connotation, so as to require that the action that "shall" be done must be done, or may be directory in meaning, so as to exhort the doing of the thing that "shall" be done without requiring it.

*In re Abiagail C.,* 138 Md.App. at 581, 772 A.2d 1277.

Because of this ambiguity, we *shall* analyze the legislative intent and purpose behind FL § 5–322. The Court of Appeals in *In re Adoption/Guardianship No. 93321055,* 344 Md. 458, 687 A.2d 681 (1997), has given a great deal of insight into this issue. In that case, a parent who had been deemed to have consented to the termination of parental rights under FL § 5–322 appealed to question whether that deemed consent could be revoked prior to judgment. In analyzing the legislative history, the Court noted:

Until 1986, § 5–322(d), as supplemented by Md. Rule D 76, required a parent who wished to object to a DSS petition for guardianship to file a formal petition to intervene in the case and, if that petition was granted, to file an answer to the petition. In the 94th Report of this Court's Standing Committee on Rules of Practice and Procedure, filed in January, 1986, the Committee recommended, and this Court later adopted, rules that replaced the intervention scheme with a simple notice of objection and required the show cause order to give clear advice as to the necessity and manner of filing an objection and as to the consequence of failing to do so.

*In re Adoption/Guardianship No. 93321055,* 344 Md. at 481, 687 A.2d 681.

The process was thus simplified and made more efficient.

In reaching its extant form containing waiver of consent and deemed consent one year later, the Rules Committee was attempting further to speed up the process. This need was made apparent by the Governor's Task Force To Study Adoption Procedures in Maryland's 1987 Report. That report

noted that an increasing number of children were drifting through the foster care system without any permanent attachments. *In re Adoption/Guardianship No. 93321055*, 344 Md. at 482, 687 A.2d 681 (citing GOVERNOR'S TASK FORCE TO STUDY ADOPTION PROCEDURES IN MARYLAND, GROWING UP ALONE: CHILDREN WAITING FOR FAMILIES (1987)). Department statistics further showed that it took a child on average over five years to be adopted after entering foster care. The delays in Baltimore City were increased by more than two years. *Id.* Thus, the Court of Appeals concluded:

> In light of this history, it is evident that any construction of ... § 5–322(d) that would have the effect of engendering further delays or imposing additional impediments to achieving permanent and stable family settings for children placed in foster care, usually as the result of a CINA proceeding, would be flatly inconsistent with and antithetical to the clear legislative purpose, and is to be avoided unless absolutely required.

*In re Adoption/Guardianship No. 93321055*, 344 Md. at 484, 687 A.2d 681.

■ Therefore, in following the dictates of the Court of Appeals, we will only create an exception to deadlines created under FL § 5–322(d) if absolutely required. Such an exception is imperative in the case at bar.

Under the totality of the circumstances in this case, it is manifest that stringent enforcement of the statutory deadline would create an unjust result. Appellants agreed to the Division of Juvenile Causes request to the court that they be adopted by a relative, and consented to the termination proceedings on the basis of that representation. We will not sit idly by and blink at the very basis on which the agreement was entered and thus deny the appellants' right to question the Department's change of horse in midstream. Indeed, the children have voiced their preference of ending up in the permanent care of a relative, and it would be unjust to eliminate that possibility after it was used as a carrot to

seduce the appellants to consent to the termination of Carol W.'s parental rights. To rule otherwise would allow the Department to alter its position at its caprice. We hold that the circuit court erred in not granting relief from the statutory deadline on the basis of this extreme change in circumstances.

Indeed, the case at bar does not in its essence challenge the termination petition. The children have actually been forced to seek a revocation of their deemed consent as a perhaps inartful means of challenging the Department's conduct. Had the Department not discarded its representation to place the children in the home of a relative, it is dubious that this challenge would have been brought.

With this background, we pause to observe that this case is unlike our recent decision in *In re Adoption/Guardianship No. T00032005*, 01–279, Slip op. (Md.App. Dec. 4, 2001). There, we concluded that the lower court did not err in granting relief from the statutory deadline to a child who was deemed to have consented to a termination petition. Everything may well be kneaded out of the same dough but not necessarily baked in the same oven. That case can be readily distinguished from the case at bar.

*In re Adoption/Guardianship No. T00032005* dealt with a minor child challenging a denial of a request to revoke his deemed consent as to a termination petition. The untimely request was made merely on the basis that he had matured and gained a better appreciation for the magnitude of the proceedings. Despite the denial of this request, we noted that the minor was able to fully present his case before the court and was, in effect, able to withdraw his consent. *Id.*, Slip op. at 21. It was further noted that the court considered the child's position but found that the child's change of heart would not alter its best interest of the child analysis. *Id.*, Slip op. at 27.

Moreover, the Department in this previous instance placed the child with his paternal grandparents. In the case at bar, however, the Department made an agreement to place the children with a relative, the Department never satisfied that

contingency. This is an important distinction because, as stated above, the case at bar is, in essence, a means of challenging the Department's failure to act pursuant to its representations.

It is therefore apparent that *In re Adoption/Guardianship No. T00032005* lacked the compelling nature of the case at bar. The present case is fraught with inequities created by the appellants' inability to challenge the Department's conduct. Thus, we conclude that the circuit court erred in not considering the changed circumstances as a justification for relief from the statutory deadline.

In resolving the circuit court's error, we find it is better to light a candle than to curse the darkness. It is apparent that such unsuitable conduct must not be allowed to stand, yet it is equally clear that an outcome causing excessive delays will run afoul of the goals of the statute. In order to remedy the trial court error, while still upholding the statutory goal, we shall remand the case for a limited hearing on the narrow question of how a withdrawal of consent by appellants would affect the outcome of the case, if at all. Implicit in our order is the need to determine if a withdrawal of consent will affect the children's ability to move into the care of a relative. This determination will consequently call for the circuit court to reassess the best interest of the children, and we will therefore not be required to discuss appellants' third question for review.

## II. Consideration of the Reports

■ Appellants contend that the circuit court erred as a matter of law in failing to give sufficient weight to the conclusion of the Juvenile Court Medical Office that Latisha would be emotionally damaged if Carol W.'s parental rights were terminated and that Dontae should remain in the same home as Latisha.

In considering the weight of the assessments, the circuit court chose to consider who offered the evidence. The court opined that had counsel for Carol W. offered the assessments,

it would have considered the evidence with greater weight, but in coming from the children, it was inconsistent with their deemed consent.

Despite the court's concerns about who offered the testimony, appellants argue that the court should not have disregarded the expert's recommendation, especially given that no contradictory expert opinion was presented at trial. Appellants argue that this failure constituted an abuse of discretion. In making this claim, appellants rely on this Court's decision in *In re Appeal No. 179*, 23 Md.App. 496, 327 A.2d 793 (1974). In that case, the trial court ordered a delinquent boy be housed in a state institution despite a psychologist's report recommending against removal of the child from the parental home. *Id.* at 498–99, 327 A.2d 793. On appeal, we vacated the trial court's decision because there was no evidence in the record to support a claim that removal of the child would be in his best interest or in the interest of the public. *Id.* at 500–01, 327 A.2d 793.

That case does not suggest, however, as appellants assert, that a court cannot disregard uncontested expert testimony. Indeed, it is well settled that a trier of fact need not agree with the opinion of an expert. As properly stated in *Gerson v. Gerson*, 179 Md. 171, 20 A.2d 567 (1941) (Delaplaine, J., dissenting):

> [O]pinion evidence, while entitled to some weight, is not so conclusive that error is committed if the court refuses to follow it. There is no rule of law which requires judges or juries to relinquish their own judgment to accept the opinion of expert witnesses. The general rule is that opinions have only such probative value as they reasonably deserve under all the circumstances of the case. While expert testimony is an aid in determining an issue and cannot be arbitrarily ignored, the tribunals should be guided in making a decision by common knowledge and experience as applied to the facts of the case, and they have a right to follow their own convictions, although their decision may be contrary to the opinion evidence of experts on the subject. *United States v. Gower*, 10 Cir., 50 F.2d 370, 371 (1931);

*The Conqueror,* 166 U.S. 110, 17 S.Ct. 510, 519, 41 L.Ed. 937 (1897); *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U.S. 290, 54 S.Ct. 647, 652, 78 L.Ed. 1267 (1934); 2 *Jones on Evidence,* secs. 390, 391, 392, 556. *Id.* at 183–84, 20 A.2d 567.

The trial court did not err, by failing to consider the expert testimony. The testimony was considered, but the court merely disagreed with the evidence because of the circumstances of the case.

### Conclusion

For the reasons set forth above, the decision of the Circuit Court for Baltimore City is remanded in order to determine how a withdrawal of consent by appellants would affect the outcome of the case. In making this remand, the court will necessarily be forced to reassess the best interests of the children with a special eye towards any possible affects the decision may have on the ability of relatives to take custody and/or adopt the children.

**JUDGMENT REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**