805 A.2d 254

**In re ADOPTION/GUARDIANSHIP NOS. T00130003 and T00130004 in the Circuit Court for Baltimore City.**

**No. 128, Sept. Term, 2001.**

Court of Appeals of Maryland.

Aug. 22, 2002.

C.J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief) Baltimore, for petitioners.

Joan F. Little (Rachel A. Markowitz, Legal Aid Bureau, Inc., on brief) Baltimore, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

This appeal is from a judgment entered by the Circuit Court for Baltimore City that granted to the Baltimore City Department of Social Services (DSS) guardianship, with the right to consent to the adoption or long-term care, of 11–year-old Latisha W. and five-year-old Dontae W. That order served to terminate the parental rights of the children's mother, Carol W., with respect to the children. The only person who objected to the petition for guardianship was Carol, who failed to appear at trial and who has not appealed the guardianship order. Latisha's father died prior to the filing of the petition; Dontae's father has never been identified.

Through their attorney, the children were formally notified of the petition for guardianship. They declined to file an objection within the time allowed by law, however, and, by virtue of Maryland Code, § 5–322(d) of the Family Law Article (FL), they were deemed to have consented to the guardianship.[1] Nonetheless, at trial nine months later, the children, through counsel, sought to oppose the guardianship. The trial court allowed counsel to participate by calling the children's foster parent as her witness, cross-examining the DSS case worker, placing certain exhibits into evidence, and

---

1. FL § 5–322(d) provides that, if a person is properly notified of a petition for guardianship and fails to file a notice of objection within the time stated in the show cause order served upon the person, "(1) the court shall consider the person who is notified to have consented to the ... guardianship; and (2) the petition shall be treated in the same manner as a petition to which consent has been given."

making argument, but it did not permit her to oppose the guardianship in derogation of the children's deemed consent.

As noted, Carol has acquiesced in the judgment, as no appeal was filed on her behalf. The children appealed, however, claiming, among other things, that the court erred in not granting them "relief from the 30 day response time for objecting to the termination of parental rights" and thus effectively denying them the right to participate at trial. The Court of Special Appeals found some merit, or at least potential merit, in that argument and remanded the case, apparently without affirmance or reversal, for the trial court "to determine how a withdrawal of consent by [the children] would affect the outcome of the case." *In re Adoption No. T00130003*, 141 Md.App. 645, 663, 786 A.2d 803, 813 (2001). We granted *certiorari* to determine whether, and under what circumstances, a court may excuse a failure to file a timely objection and permit a non-objecting party actively to oppose the petition to which he or she has, by law, consented.

## BACKGROUND

The record in this case, like those in most termination of parental rights cases, is a sad and distressing one. Carol, a persistent drug abuser, has four children, each by a different father—Tylita, born in 1983; Ashley, born in 1986; Latisha, born in 1989; and Dontae, born in 1995. Until April, 1993, when Carol attempted suicide, Tylita, Ashley, and Latisha lived with her. Upon Carol's hospitalization, Tylita was moved to her father's home, and Ashley and Latisha were placed with Ashley's father. On December 14, 1993, Tylita and Latisha were found by the Juvenile Court in Baltimore City to be children in need of assistance (CINA). Ashley and Latisha continued to live with Ashley's father, and Tylita was placed in foster care.

In November, 1996, Ashley's father returned Latisha to her mother. A month later, however, Carol was arrested for beating Latisha with a belt and, for that offense and various probation violations, spent the next four years and two months

in prison. Latisha and Dontae were placed in foster care and, in May, 1997, Dontae was found to be CINA. Latisha already had that status. The request for shelter care for Latisha alleged, among other things, that Carol's drug abuse rendered her "unable to provide consistently adequate care" for the children, that the beating of Latisha was an act of abuse, that Carol "would lock the apartment door and leave [Latisha] unsupervised for extended periods of time," that she "failed to provide adequate food and clothing" for the child, and that the home was rat-infested and full of trash. Eventually, Latisha and Dontae were placed with their current foster parents, Jimmy and Theresa H.

In accordance with applicable statutory and regulatory requirements (see FL § 5–525(e); Courts and Judicial Proceedings Article § 3–823; and COMAR 07.02.11.13), DSS developed a permanency plan for the children in November, 1997, that called for the children to be placed with a "suitable relative" by February, 1998. In its December, 1997 Case Recommendation Report, the Foster Care Review Board disagreed with that goal on the ground that "no relatives have decided to be a resource." [2] The Board noted that it had been informed by DSS in June, 1997, that the plan would be changed to adoption, expressed the view that "progress is inadequate," and strongly urged DSS to present the matter to its TPR (termination of parental rights) Committee "immediately."

That did not occur. In its June and December, 1998 reviews the Foster Care Review Board again "non-concurred" with the "suitable relative" placement goal and, noting that neither child had "relative resources," urged that the plan be changed to adoption. In its December review, the Board pointed out that DSS was aware in June "that there were no relative resources" for the children. Still, DSS persisted.

---

2. Foster Care Review Boards are created in Baltimore City and each county pursuant to FL § 5–540. They are responsible for reviewing cases of children in out-of-home placement and making written reports and recommendations to both DSS and the Juvenile Court. See FL § 5–545.

The case plan it prepared in February, 1999, continued to show placement with a "suitable relative" as the goal, with a projected achievement date of August, 1999.

In June, 1999, the Foster Care Review Board noted the objective of placement with a suitable relative by August, but also stated that DSS "presented a concurrent plan of adoption" and stated its agreement with "that goal." In light of the fact that the children had been in out-of-home placement for at least 15 of the past 22 months, the Board recommended that a petition for termination of parental rights be filed.[3] DSS ignored that recommendation, as it had the previous recommendations, and continued to posit suitable relative placement as the objective. In its January, 2000 plan, it estimated an achievement date for relative placement of June, 2000, and adoption by August, 2001. That changed in the February, 2000 plan, which, though showing suitable relative placement by December, 2000, and making no mention of adoption, stated that it would submit "show cause papers" to the TPR Committee.

In each of its updates during this period, DSS noted that the children had bonded well with their foster family, that the case worker was in contact with Carol, who remained incarcerated, and that, although visits were "sporadic," Carol kept in contact with the children by mail. The goal for achieving placement with a suitable relative had been moved each time, in the aggregate from February, 1998, to December, 2000— just shy of three years. Throughout this period, the children were being represented by the Legal Aid Bureau which, through periodic review proceedings in the Juvenile Court, was aware of the problem in finding a suitable relative to assume responsibility for the children.

---

**3.** With certain exceptions not apparently relevant here, FL § 5–525.1(b)(1) requires a local department to which a child is committed under § 5–525 to file a petition for termination of parental rights if the child has been in out-of-home placement for 15 of the most recent 22 months.

On May 8, 2000, the DSS TPR Review Committee approved the filing of a guardianship petition and directed a change in the permanency plan to adoption, and, pursuant to that approval, DSS filed such a petition a week later. In conformance with Maryland Rule 9–105, show cause orders were issued to Latisha and Dontae and served, on May 17, 2000, on the Legal Aid Bureau. The show cause order informed the children, through their attorney, that, if they wished to object to the guardianship, they must do so within 30 days after service, which, counting an extra three days pursuant to Maryland Rule 1–203(c), would have been June 19, 2000. No objection was filed on behalf of either child. Accordingly, on June 20, 2000, both children, by operation of law, were deemed to have consented to the respective guardianships. Carol filed an objection to the petition, thereby triggering the need for an adjudicatory proceeding to determine whether the statutory criteria for guardianship had been satisfied.

By the time the case came to trial nine months later on March 29, 2001, Carol had essentially abandoned her objection. Although she had been released from prison in January and had been notified of the trial date by her attorney, she did not attend. Neither her attorney nor the case worker from DSS knew her current whereabouts. Because, despite her attorney's best efforts, she had failed to communicate with the attorney prior to trial, no evidence was presented in her case. Through their counsel, however, the children sought to contest the guardianship and to present evidence and argument in support of their new position.

The children had not been brought to court and therefore were in no position either to testify or to be interviewed in chambers. Their attorney wanted to "proffer" their testimony, without indicating in any detail what it would be, but, in the face of an objection by *Carol's* attorney, who insisted that there be live testimony, the court disallowed the proffer. Noting our decision in *In re Adoption No. T97036005*, 358 Md. 1, 746 A.2d 379 (2000), the court permitted their attorney to call the foster care parent as her witness, to cross-examine the DSS case worker, and to put in evidence the children's medical

records. Aside from the unspecified proffer of the children's testimony, that was all of the evidence offered by the attorney. The court refused, however, to allow the children to revoke their statutory consent and to continue the case in order that the children might present evidence in derogation of that consent. Upon the evidence presented, the court found that the statutory criteria had been satisfied and entered an order of guardianship that terminated Carol's parental rights.

As noted, Carol has acquiesced in the judgment. The children appealed, however, complaining, among other things, that the court erred in refusing to allow them to revoke their statutory consent and actively contest the guardianship. The position argued to the Court of Special Appeals was quite different from that asserted in the trial court. At trial, counsel indicated only that, in the ten months between service of the petition and trial, Latisha had changed her mind and that Dontae, who had not articulated a position, should remain with his sister.[1] In the appellate court, counsel argued, for the first time, that the children "agreed to adoption as a permanency plan subject to the *contingency* that a relative adopt them," and that *"the contingency* upon which [their] agreement to adoption was based has not been fulfilled." (Emphasis added). She claimed that, in light of that non-fulfillment, the trial court erred in not excusing the children from their deemed consent.

The intermediate appellate court accepted as though it were fact that such an agreement or contingency existed and came very close to accusing DSS of misrepresentation.[5] It looked at

---

4. That assertion had been made earlier to the court at a preliminary motions hearing held February 21, 2001. Counsel asked at that time that the court extend the statutory deadline for objecting, stating that Latisha had made a "180 degree turn about." Because she had not interviewed Dontae, she was unsure of his wishes. The court denied the request to extend the deadline.

5. Obviously disturbed by what the court believed to be an "agreement to place the children with a relative," the court declared that it would "not sit idly by and blink at the very basis on which the agreement was entered and thus deny the appellants' right to question the Depart-

the issue in terms of whether the statutory deadline for noting an objection should be rigidly enforced—whether the court should "create an exception to deadlines created under FL § 5–322(d) if absolutely required." *In re Adoption No. T00130003, supra,* 141 Md.App. at 659, 786 A.2d at 811. It thus seemed to approach the issue in terms of whether the time for making a final decision to object can be extended beyond the statutory deadline established by the Legislature in § 5–322 and by us through Maryland Rule 9–107(b), rather than whether a party who, by failing to file a timely objection is deemed to have consented, may later avoid that consent and have a right to oppose the guardianship.

The intermediate appellate court acknowledged our conclusion in *In re Adoption No. 93321055,* 344 Md. 458, 485, 687 A.2d 681, 694, *cert. denied,* 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997), that the direction in FL § 5–322(d)(1) means what it says and expresses a clear intent by the Legislature to cut off the right of a person who fails to file a timely objection to participate in the action. Seizing on a statement in that Opinion that " 'any construction of ... § 5–322(d) that would have the effect of engendering delays or imposing additional impediments to achieving permanent and stable family settings for children in foster care' " is to be avoided " 'unless absolutely required,' " however, and concluding, as a fact, that the children agreed to the guardianship on the basis of an "agreement" by DSS that they would be adopted by a relative, that court determined that "stringent enforcement" of the law "would create an unjust result," and that an extension of the time to object was therefore absolutely required. *In re Adoption No. T00130003, supra,* 141 Md. App. at 659, 786 A.2d at 811 (quoting *In re Adoption No. 93321055, supra,* 344 Md. at 484, 687 A.2d at 693).

───────

ment's change of horse in midstream." *Id.* at 660, 659, 786 A.2d at 812, 811. Parroting Eleanor Roosevelt, the court declared that "it is better to light a candle than to curse the darkness," and that it would not let "such unsuitable conduct" stand. *Id.* at 661, 786 A.2d at 812.

## DISCUSSION

We laid much of the groundwork in this area in *In re Adoption No. 93321055, supra*, 344 Md. 458, 687 A.2d 681, a collection of cases in which parents had been served with petitions for guardianship, had failed to file timely objections, and then, after the time for objecting had expired, sought, in one fashion or another, to object to the guardianships or, in four of the cases where judgments of guardianship had already been entered, to set them aside. Because of procedural deficiencies in some of the cases, the only ones before us on the merits of the issue were the two in which enrolled judgments of guardianship had been revoked by the Circuit Court and the cases reopened in order to permit the mother to seek retention of her parental rights.

We traced at some length the development of the public policy embodied in FL § 5–322(d) and the implementing rules of this Court, which need not be repeated here. Suffice it to say that, upon service of a petition for guardianship that, if granted, would terminate parental rights, the parent has three choices, all of which are carefully explained in the accompanying show cause order: the parent can (1) object to the guardianship by filing a simple pre-printed notice of objection attached to the show cause order within the time set forth in the show cause order, and thereby trigger a contested case; (2) affirmatively consent, subject to the ability to withdraw the consent within 30 days after it is signed; or (3) do nothing, in which event, upon expiration of the time allowed for filing an objection, the parent will be deemed by operation of law to have consented to the guardianship. We pointed out that the effect of doing nothing had been the subject of considerable debate, in terms of whether it should be construed as a *waiver* of the requirement of consent or as an actual "deemed" consent, and that the legislative choice was to regard inaction as a consent by operation of law. We said, in that regard, that the intent of the Legislature was "to eliminate any uncertainty over the effect of a parent's failure, after proper notice, to file a timely objection," and that:

"[t]he sole purpose of regarding such a lapse as a statutory consent imposed by operation of law and directing the court to proceed accordingly was to treat the case thereafter as though it were uncontested—to avoid the need for further notice and hearing and thus to speed up the judicial component of the permanency planning process."

*Id.* at 483, 687 A.2d at 693. In furtherance of that view, we added that:

"[i]n light of this history, it is evident that any construction of [FL] § 5–317(e) or § 5–322(d) that would have the effect of engendering further delays or imposing additional impediments to achieving permanent and stable family settings for children placed in foster care, usually as the result of a CINA proceeding, would be flatly inconsistent with and antithetical to the clear legislative purpose, and is to be avoided unless absolutely required."

*Id.* at 484, 687 A.2d at 693–94.

Upon that construction of the statute, we held that "there is no right to revoke a statutory consent arising under [FL] § 5–322(d)." *Id.* at 486, 687 A.2d at 694. Because that consent arises by operation of law, rather than volitionally, "it is not within the power of the parent to revoke it." *Id.*

We turned then to an issue raised in the three cases that were moot but that we decided was important to address nonetheless—whether, even though the *parent* has no right to *revoke* a "deemed" consent arising from his or her failure to file a timely objection, the *court* has some authority to consider a late-filed objection. The argument was made that the court had such authority under Maryland Rules 1–204(a) and 2–613 and as a matter of due process. We found that, under their own language, the two rules were inapplicable. The due process argument presented by the Public Defender was premised on the prospect of a parent who is physically unable to respond timely to a petition because he or she lapses into a coma upon service of the petition. We responded that something so extreme might indeed present a due process problem that would require, as a matter of Constitutional imperative,

the excusing of a late objection, but that no such circumstance existed in the pending cases, and the unlikely prospect of one did not justify a frontal attack on the time requirement: "In judging the facial validity of the procedure, we must look to the normal case, not to a conjured, hypothetical aberration." *Id.* at 493, 687 A.2d at 698.

■ The "bottom line," so to speak, of *In re Adoption No. 93321055* is that FL § 5–322(d) indeed means what it says, that a parent who, after proper notification, fails to file a timely objection is deemed to have consented to the guardianship, and that, absent some extraordinary circumstance that would require a different result as a matter of due process, a Circuit Court has no authority to accept a late-filed objection but must treat the case, as to the non-objecting parent, as though it were uncontested.

*In re Adoption No. 93321055* involved only the rights of parents. In *In re Adoption No. T97036005*, 358 Md. 1, 15, 746 A.2d 379, 386–87 (2000), we held that children who had been the subject of CINA proceedings and who later become the subject of a guardianship petition also are parties to the guardianship action and have the same right as the parents to participate. In that collection of cases, the parents had either affirmatively consented or had been deemed to have consented to the respective guardianships, and it was the children who wished to object. DSS argued that the children essentially were bound by the decision of their parents and had no right to force a contested proceeding when the parents consented to the guardianship. We disagreed. We held that, as the children were statutory parties to the CINA proceedings, that status carried over to the guardianship actions, and that they had an independent right of notice and opportunity to object. The underpinning of that decision was the recognition that the termination of parental rights affects the children as much as it does the parents and required, as a matter of Maryland statutory law, that the children, usually through counsel, have the same right to oppose a guardianship petition as the parents.

That parity does not give the children greater rights than their parents, however. They are entitled to notice of the petition, through either the attorney who represented them in the CINA action or another attorney appointed to represent them, to file an objection to that petition, and, if they do so in a timely manner, to oppose the petition as parties in the case. As occurred here, they are served, through the attorney, with the same show cause order that is served on the parents and they have the same ability to consent, object, or do nothing and be deemed to have consented. If, as here, they do nothing within the time allowed in the show cause order, they have the same status the parent would have under that circumstance.

That status does not absolutely foreclose any participation in the action, however. There are two circumstances, or categories of circumstances, under which children or parents, properly served with notice and having counsel available to them but who fail to file a timely objection, may be permitted to participate in the guardianship case. The first, which we alluded to in *In re Adoption No. 93321055,* is where the failure to file a timely objection was based upon some extraordinary circumstance of such a compelling nature as to make it fundamentally unfair to regard the failure as an effective consent. Certainly, the kind of problem postulated by the Public Defender in that case—a true physical inability to file a timely objection—would qualify. So, too, would inaction based on the kind of duress or misrepresentation that would suffice to render the decision not to object involuntary and not the exercise of free will.

Mindful that parental rights have Constitutional protection and that their termination by the State must comport with strict due process requirements, *see In re Adoption J9610436,* 368 Md. 666, 669–72, 796 A.2d 778, 780–81 (2002), we believe that, in declaring non-action after proper notification to constitute a consent, the Legislature intended for the non-action to be the product of free will and not induced by legally cognizable coercion or the misrepresentation of material facts. That is a narrow window, however. The circumstances that lead to

petitions for guardianship are almost always difficult, and often there are few practical options for the parents or children. It is rare, we expect, that either the parents or the children, in a better world, would choose to allow their legal ties to be severed. Neither circumstantial constraints, however, nor mere hopes or expectations that are not realized will suffice to render the decision not to object non-volitional, but only the kind of conduct that would constitute duress or misrepresentation sufficient to vitiate a contract.

■ In *U.S. for Use of Trane Co. v. Bond*, 322 Md. 170, 183, 586 A.2d 734, 740 (1991), we defined the kind of duress sufficient to render a contract void as:

"the actual application of physical force that is sufficient to, and does, cause the person unwillingly to execute the document; as well as the threat of application of immediate physical force sufficient to place a person in the position of the signer in actual, reasonable, and imminent fear of death, serious personal injury, or actual imprisonment."

To permit rescission of a contract for misrepresentation, the plaintiff must show that a false representation of material fact was made and was actually relied upon by the plaintiff. Unlike in a tort action for deceit or fraud, the maker of the representation does not need to know of its actual or probable falsity and does not have to act with an intent to deceive. *See Shulton, Inc. v. Rubin*, 239 Md. 669, 686, 212 A.2d 476, 486 (1965); *Euzent v. Barrash*, 180 Md. 451, 455, 25 A.2d 462, 464–65 (1942); *Hutson v. Hutson*, 168 Md. 182, 187, 177 A. 177, 179 (1935); *Tucker v. Osbourn*, 101 Md. 613, 618, 61 A. 321, 322–23 (1905).

As we have indicated, the only ground asserted by the children in the trial court as justification for relieving them of the deemed consent was that Latisha had changed her mind. That clearly does not suffice, for, if it did, § 5–322(d) and the carefully crafted public policy embodied in it would be rendered meaningless. The deadline for objecting established both by the Legislature and by us through implementing rules, is not an arbitrary one. It serves an important public

purpose and is carefully explained to the parties in the show cause order. The Circuit Court did not err in refusing to allow the children to escape their deemed consent based on a change of mind.

The ground asserted in and accepted by the Court of Special Appeals which, as noted, was never raised in the Circuit Court, lay somewhere between an unrealized hope or expectation and some sort of misrepresentation—that the children's decision not to object to the petition, was induced by an understanding or agreement that, if the guardianship was granted, the children would be placed with or adopted by a family relative. The children say in their brief to us that they "were promised a relative placement by the Department and that promise never materialized." The problem is that there is utterly no evidence in the record to support a conclusion that, at the time the children, through counsel, had to make a decision whether to object to the petition, DSS had made any representation, or promise, or agreement, or commitment that, if the guardianship was granted, the children would be placed with a family relative.

In support of her assertion, counsel for the children makes a number of statements that, at best, are unsupported by evidence. She avers, for example, that, "[t]hroughout the permanency planning review hearings, the court continuously ordered the Department to investigate relative resources," citing to a number of "CIP Review" stipulations. Those stipulations, however, entered in June, 1998, September, 1998, February, 1999, and July, 2000, contain no such order. The June, 1998, stipulation notes that the permanency plan was "relative placement," which at the time it was, but adds that "no relative resources have been located for Latisha and Dont[a]e." The September, 1998, stipulation states that a maternal aunt was willing to care for the children "but does not currently have the room" and that the mother "would also like them placed with her sister." The February, 1999, stipulation recounts that the permanency plan "has been relative placement, but no relatives are available to care" and that DSS was reviewing the plan to determine whether "Latisha's

and Dont[a]e's should be changed to adoption." None of those documents embody orders to investigate placement with a relative, and none of them contain any kind of promise, commitment, or agreement in that regard.

The document most relied upon is the stipulation signed on July 14, 2000, which counsel treats as "an order which incorporated an agreement between all the parties to specify a concrete plan for transitioning the children to a maternal aunt's home." For one thing, that is not an accurate characterization of the stipulation. It says, in relevant part:

> "The BCDSS plans for Dont[a]e and Latisha are adoption. Mother is opposed to the plan of adoption at this time. A maternal aunt *may* be an adoptive resource for Respondents and mother would be in agreement with her adopting. BCDSS has assessed her home, *but has not yet done the required background investigation.* The aunt has regular telephone contact with Latisha and BCDSS will be *starting* visits at her home soon. *If visits go well,* BCDSS will transition Respondents to the home *once the background investigation has been completed.*"

(Emphasis added). We do not regard that as a "concrete plan" for transitioning the children, and clearly it does not constitute a commitment or agreement to place the children with the aunt.[6]

---

6. There is nothing in the record to indicate whether DSS ever completed the background investigation of the aunt, if so what it revealed, whether the aunt remained a possible placement resource, or, if not, why not. The record shows that, in July, 2000, the aunt consented to a computerized search to determine her fitness as a potential care giver and that, in early September, a weekend visit took place with the aunt. The case worker commented that Dontae was confused about spending an overnight with the aunt and kept talking about his foster parent. On October 20, 2000, the case worker indicated that DSS was "trying to see if [the aunt's] house will be a better place for the children to live as a relative placement." All of this information was included in the DSS file, which was admitted into evidence. As noted, counsel for the children was permitted to, and did, cross-examine the DSS case worker and, presumably, would have been permitted to call her as the children's witness if she wanted to elicit information beyond the scope of the direct examination, but she never inquired as to those matters.

██   Even if it did rise to that level, however, it could not have served as an inducement for the children to withhold an objection.   As noted, the show cause order required an objection to be filed, at the latest, by June 19, 2000.   The stipulation in question was entered into on July 14, 2000, nearly a month after the deadline for objecting had passed.   It is clear, then, that, although the Court of Special Appeals was correct in concluding that relief may be available to a party whose non-action was induced by a material misrepresentation, it was wrong in finding that such a circumstance existed in this case.

Even where there is no basis for allowing relief from a deemed consent on some ground noted above, there is yet another circumstance in which the consenting person may be permitted to participate in the action.   If *all* of the parties having a right to oppose the petition have consented to the guardianship, either affirmatively or through inaction, there will ordinarily be no contested proceeding.   The major thrust of § 5–322(d) is to avoid the need for such a proceeding in that situation.   If any such person does object, however, a trial becomes necessary, and the court must then take evidence and make findings with regard to the various factors set forth in FL § 5–313(c) and (d).   The objecting party may then offer whatever evidence is relevant, including testimony from non-objecting parties.   In addition, the court may on its own initiative, "where justice so requires," call and examine its own witnesses.   *See* Maryland Rule 5–614.   Unquestionably, Carol's attorney could have called the children to testify in her case and could have elicited information bearing on those statutory factors, including the children's wishes.   *See* FL § 5–313(c)(2)(ii).   Moreover, under Rule 5–614(a), the court itself could have called the children, either to testify or to be interviewed in chambers.   So long as there is at least one

---

Although one general question about the children's contact with biological relatives was disallowed as being outside the scope of direct examination, it is not clear that questions relating to the aunt's availability as a placement resource would have been inconsistent with the children's deemed consent and may well have been allowed by the court.

objecting party, the ability to elicit relevant evidence from non-objecting persons is not foreclosed.[7]

Here, as noted, the court went even further, by allowing the children's attorney to present evidence bearing on the petition. What it declined to do, properly in our view, is to relieve them from the effect of their deemed consent simply because, in the view of their attorney, one of them had changed her mind. The Court of Special Appeals erred in remanding the case. It should have affirmed the judgment.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT FOR BALTIMORE CITY; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY LEGAL AID BUREAU, INC. AS COUNSEL FOR RESPONDENT CHILDREN.

---

7. We call attention also to the caveat noted in *In re Adoption No. 93321055, supra,* 344 Md. at 487–88, 687 A.2d at 695, that, by virtue of FL § 5–319, if an adoption placement is not made within nine months after entry of a guardianship judgment, the court must conduct a hearing to review the progress made toward adoption and "take whatever action the court considers appropriate in the child's best interest."